581 A.2d 483

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
NATHANIEL HARVEY, DEFENDANT–APPELLANT.

Argued March 27, 1990—Decided October 18, 1990.

408

*Edward A. Kopelson* and *Robert D. Westreich,* Designated Counsel, argued the cause for appellant (*Thomas S. Smith, Jr.,* Acting Public Defender, attorney).

*Lisa Sarnoff Gochman*, Deputy Attorney General, argued the cause for respondent (*Robert J. Del Tufo*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

CLIFFORD, J.

Defendant, Nathaniel Harvey, appeals from a capital-murder conviction and death sentence. Because the trial court's jury instructions at the guilt phase did not comply with our later holding in *State v. Gerald*, 113 *N.J.* 40, 549 *A.*2d 792 (1988), we reverse the conviction and remand for a new trial.

I

—A—

After Irene Schnaps failed to appear for work on June 17, 1985, a colleague went to her apartment at the Hunter's Glen complex in Plainsboro. When no one answered, he entered through the unlocked door and found Schnaps dead on the bedroom floor. She had suffered severe head and facial wounds.

The police found an empty box for a Seiko LaSalle watch on the dressing table in the bedroom. An empty camera box was in the closet, and an open purse sat atop the vanity in the bathroom. A pillowcase had a bloody sneaker print bearing a chevron design and the letters "PON." There were no signs of forced entry; the sliding glass door was closed but unlocked.

Dr. Martin Shuster performed an autopsy. He concluded that Schnaps had suffered numerous skull fractures, a fractured jaw, and a deep laceration on her skull. Dr. Shuster believed that she had been struck at least fifteen times with a blunt object. Pressure applied to her neck for an hour had caused contusions. In Dr. Shuster's opinion, a brief interval separated the first blow and death. He could not determine

which blows had been fatal and which had been inflicted after the victim's death.

—B—

On October 28, 1985, the police arrested defendant on suspicion of kidnapping and burglary. Following several interrogations over the next three days, defendant admitted that he had killed Irene Schnaps. He said that on June 16 he had gone to the Hunter's Glen apartment complex. Entering Schnaps' apartment through an unlocked patio door, he went into the bedroom, where he took a watch and some jewelry from the dresser. Schnaps, who had been sleeping, woke up and punched him in the nose, causing it to bleed. Defendant then struck her in the head with a "hammer-like" object, knocking her to the ground. Afraid that the blood from his nose had stained the sheets, he replaced them with clean ones from the closet. He then retrieved a towel from the bathroom and wiped the blood off of Schnaps' body. After collecting the bed sheets, the towel, the watch, a camera, and other pieces of jewelry, he left the apartment.

A jury convicted defendant of the knowing and purposeful murder of Irene Schnaps, felony murder, first-degree robbery, and second-degree burglary. Following a penalty-phase proceeding on the capital-murder conviction, the trial court sentenced defendant to death.

II

We first consider defendant's contention that the trial court's failure to instruct the jury separately for the crimes of knowingly or purposely causing death (intentional murder) and of knowingly or purposely causing serious bodily injury resulting in death (serious-bodily-injury murder) requires reversal of his conviction. In *State v. Gerald, supra,* 113 *N.J.* at 69, 549 *A.*2d 792, we held that a person who is convicted of serious-bodily-injury murder under *N.J.S.A.* 2C:11–3(a)(1) or (2) may not be

sentenced to death. If the evidence provides a rational basis for a jury to convict a defendant of either intentional or serious-bodily-injury murder, the trial court "must instruct the jury to specify which, if [either], of those findings forms the basis for a conviction." *State v. Coyle*, 119 *N.J.* 194, 209, 574 *A.*2d 951 (1990).

In arguing that there was no rational basis for a finding of serious-bodily-injury murder, the State points to the medical evidence suggesting that the victim had been hit fifteen times in the head with a blunt instrument and that her neck had been squeezed for an hour. The victim's jaw was broken. Defendant confessed that he had hit her with a "hammer-like object."

Of course, such repeated blows can support a jury finding of intentional murder. However, the issue here, as in other pre-*Gerald* capital cases, is whether that *was* the jury's determination. The jury was not asked to distinguish between intentional murder and serious-bodily-injury murder. Its verdict did not indicate which of the two it found to apply to this case. Although it might seem probable that the jury had intentional murder in mind, the question is whether there is a rational basis in the evidence on which the jury, if instructed to distinguish between the two, might return a verdict of serious-bodily-injury murder. If there is, then the jury, as the finder of fact, must decide the matter. An appellate court cannot.

The State conceded that defendant's initial intent was to commit burglary, not murder. Defendant confessed that he had struck the victim only once, in response to being hit in the nose. That evidence suggests that defendant may have intended only to injure the victim, not to kill her. We note too that while arguing for purposes of the *Gerald* issue that the number of blows inflicted unquestionably establishes an intention to kill, the State claims for penalty-phase purposes that the first blows were intended to injure and inflict pain before death rather than to kill. See *infra* at 434, 581 *A.*2d at 496 (discussion of c(4)(c) aggravating factor).

The jury was free to reject the pathologist's testimony and accept the other evidence that indicated a lack of murderous intent. *See State v. Crisantos (Arriagas)*, 102 *N.J.* 265, 273, 508 *A*.2d 167 (1986) (a jury has "the power to disregard even overwhelming proof"). This was not merely a one-issue case requiring the jury to determine only whether defendant had in fact been the one who had inflicted the intentionally-fatal blows. The mental state of the perpetrator was also clearly in issue here. The trial court instructed the jury not just on capital murder, but also on felony-murder, aggravated manslaughter, and manslaughter. Obviously, then, the trial court believed the evidence would allow the jury rationally to convict on one of those counts while acquitting defendant on capital murder. A rational jury could have concluded that defendant inflicted the fatal blows but had not intended to kill. The determination of whether defendant had the *mens rea* necessary to permit the State to put him to death is quintessentially one that our system of law entrusts to juries. All mental states related to the law of homicide were developed over a long period of history for the purpose of distinguishing capital murders from others. Wechsler & Michael, "A Rationale of the Law of Homicide I," 37 *Colum.L.Rev.* 701 (1937). Determining a defendant's mental state is the special function of the jury, not of this Court.

The record provided "a rational basis for the jury to find that the defendant intended to cause only serious bodily injury." *State v. Coyle, supra,* 119 *N.J.* at 209, 574 *A*.2d 951. Because the trial court understandably failed to anticipate *Gerald* and did not instruct the jury to distinguish that offense from intentional murder, we reverse defendant's capital-murder conviction.

## III

We turn now to those alleged errors that might arise again at retrial.

—A—

Defendant argues that the trial court should have suppressed his confession. He claims that on five occasions he asserted his right to remain silent, but that the police did not "scrupulously honor" his invocations. *See Michigan v. Mosley,* 423 *U.S.* 96, 103–04, 96 *S.Ct.* 321, 326, 46 *L.Ed.*2d 313, 321 (1975). Defendant contends that the police violated the bright-line test adopted in *State v. Hartley,* 103 *N.J.* 252, 511 *A.*2d 80 (1986), by not re-informing him of his *Miranda* rights after each invocation of his right. He also alleges that his confession was not voluntary.

—1—

The police arrested defendant at about 7:30 a.m. on October 28, 1985. When they reached the station an hour later, the police read the *Miranda* warnings to defendant, who then signed a rights form. The police did not question him that morning.

At 3:37 that afternoon, Sergeant Hibbs and Detective Swanhart began interrogating defendant. They again gave *Miranda* warnings to defendant, who signed another rights form. After eliciting personal information from defendant, the police started asking him about other crimes. At about 4:10 p.m. they questioned him about the Schnaps murder. Defendant denied responsibility, began to cry, and "asked for time to think, he wanted time by himself * * *." The questioning ceased and the police returned defendant to his cell. Forty minutes later the police brought defendant back to the interrogation room. On the way an officer "reminded" him of his rights but did not issue the formal *Miranda* warnings. When the police asked defendant about the Schnaps murder, he again began crying and said: "[B]efore I talk or say anything else I want to talk to my mother-in-law Pearl Thomas."

Thomas arrived at the station an hour later and spoke with defendant for five minutes in his cell. At 7:30 p.m. the police took defendant back into the interrogation room. They gave

him no *Miranda* warnings or reminders. When the police broached the Schnaps murder at 8:00 p.m., defendant again began to cry and said that he "just didn't do anything." According to one of the officers, the questioning then ended, "not at his request or our request, it was a mutual thing." Defendant was returned to his cell.

Fifteen minutes later defendant asked to speak with Detective Swanhart alone. Swanhart "reminded" defendant of his rights and talked to him for an hour and a half. Defendant did not admit killing Irene Schnaps but he did confess to other crimes.

Around midnight a detective from the prosecutor's office spoke to defendant about the murder. He orally advised defendant of his *Miranda* rights. The interview lasted only a couple of minutes, and defendant did not give a statement.

The next morning, October 29, two officers took defendant for a one-hour car ride to the scenes of the crimes he had admitted the night before. No *Miranda* warnings were given.

At defendant's arraignment that day for offenses unrelated to the Schnaps murder, the municipal court did not ask him if he had or desired an attorney. That afternoon defendant was read his *Miranda* rights and signed a rights form. During the interrogation he consented to searches of his room and car. The search of the car turned up a Seiko LaSalle watch, later identified as having belonged to Schnaps' deceased husband.

That night the police interviewed defendant in a holding room at the jail. After reading defendant his *Miranda* rights, the police told him that they had found the watch in his car. Defendant "responded as if talkin' to himself, he said, oh, not in the car, he said no, no, not in the car." Defendant again denied involvement in the Schnaps murder.

The next day, October 30, defendant was arraigned in Superior Court for the murder of Schnaps. At about 10:00 that morning, after reissuing defendant his *Miranda* rights, the police started questioning him about the Schnaps murder.

Shortly after 11:00 a.m., defendant informed the officers that "he would tell [them] about the murder but he first wanted to speak to his father." Questioning ceased, and arrangements were made to transport defendant's father to the jail. Defendant had lunch and talked to the officers about "things in general." At 2:15 p.m. defendant went to the prosecutor's office, where he spoke with his father for fifteen minutes before returning to jail.

At 2:30 p.m. the interrogation resumed without new *Miranda* warnings or reminders. Defendant confessed having killed Schnaps. The police took him back to the prosecutor's office for a formal statement. When they read him his *Miranda* rights, defendant demanded an attorney. Questioning ceased.

—2—

█ Defendant claims that he asserted his right to silence four times on October 28, two days before his confession: at the 3:30 p.m. interrogation when he asked for "time to think * * * by himself"; at the 5:00 p.m. interrogation when he asked to speak to his mother-in-law; at 7:00 p.m. when he "asked for more time"; and at the 7:30 p.m. interrogation when he began to cry and said that he "just didn't do anything."

The only statement that defendant seeks to suppress is his confession of October 30. Because of the intervening events between the alleged invocations on October 28 and the confession, we need not decide whether defendant actually invoked his right to remain silent and whether the police scrupulously honored those alleged requests. Even if the police did not scrupulously honor defendant's alleged invocations of his right to silence, the confession was "sufficiently independent to dissipate the taint of their illegal conduct." *State v. Johnson,* 118 *N.J.* 639, 653, 573 *A.*2d 909 (1990).

The determination of whether a confession was the "fruit" of prior illegal police conduct involves three factors:

> (1) the temporal proximity between the illegal conduct and the challenged evidence; (2) the presence of intervening circumstances; and (3) the flagrancy and purpose of the police misconduct. [*Ibid.*]

None of those factors helps defendant. First, his confession was not "temporally proximate" to the alleged violations—it occurred two days later—nor did it follow a prolonged illegal detention. See *id.* at 654–55, 573 *A.*2d 909 (repeated constitutional violations during illegal ten-hour detention preceded defendant's escape).

■ Second, a number of intervening circumstances separated the alleged violations of October 28 from the confession. At 8:15 p.m. on October 28, after the fourth alleged invocation, defendant asked to speak with Detective Swanhart alone. Fresh *Miranda* warnings are not necessary if the accused initiates conversation after invoking the right to silence. *State v. Fuller*, 118 *N.J.* 75, 570 *A.*2d 429 (1990). Moreover, defendant was reminded of his rights at that time as well as later that evening. The next day he was arraigned before a municipal court judge. After receiving new *Miranda* warnings that afternoon, he signed a rights form. That evening he was read his rights again. The following day, October 30, he was arraigned a second time and received the *Miranda* warnings again.

Finally, there is no evidence of police coercion or misconduct. There were no extended interrogations designed to wear down defendant's will. Even if defendant had invoked his right to remain silent on October 28, any possible taint from the police's alleged failure scrupulously to honor his invocations was sufficiently dissipated.

■ The fifth time defendant allegedly invoked his right to remain silent was on October 30 when he asked to talk to his father. Although defendant indicated that he would talk about the Schnaps murder when questioning resumed, there was a significant break in the interrogation. Approximately three-and-one-half hours passed before the police resumed the inter-

rogation. But what makes the interruption significant is not its length so much as its nature. The request here was qualitatively different from the one in *State v. Bey*, 112 *N.J.* 123, 139, 548 *A.*2d 887 (1988) (*Bey II*), in which the defendant "requested permission to lay down and to think about what happened." The Court likened that situation to one in which a defendant asks for "something to eat or drink, the use of toilet facilities, [or] the opportunity to stand and stretch * * *." *Ibid.* Defendant's request here was not for a brief respite to satisfy physical needs. Instead he was asking, after three days in custody, for the chance to consult with a close family member.

Defendant's request is similar to the one in *State v. Hartley*, *supra*, 103 *N.J.* at 258, 511 *A.*2d 80, in which the defendant told the police, "I don't believe I want to make a statement at this time." In both cases the defendant suggested that he would talk to the police later. "[A] request to terminate an interrogation must be honored 'however ambiguous.'" *State v. Bey*, 112 *N.J.* 45, 64, 548 *A.*2d 846 (1988) (*Bey I*) (quoting *State v. Kennedy*, 97 *N.J.* 278, 288, 478 *A.*2d 723 (1984)). Certainly the request here was no more equivocal than the one in *Bey I* in which, according to the police, the defendant had "indicated he did not want to talk * * * about it * * *." *Ibid.* Defendant's conduct during three days of interrogation and his refusal to answer questions about the Schnaps murder likewise indicated that he did not want "to talk about it."

This case also resembles *Law v. State*, 21 *Md.App.* 13, 318 *A.*2d 859 (1974), in which the police were questioning the wounded defendant as he lay handcuffed to his hospital bed. The defendant told the police that "he didn't want to talk any more until he was further treated." *Id.* at 36, 318 *A.*2d at 872 (emphasis deleted). Despite his request, the police continued to question him. The court held that the defendant's ensuing statement was inadmissible. Although the obvious difference from this case is that here defendant was not wounded, the court's decision in *Law* rested on the defendant's words, not on the surrounding circumstances. In both this case and *Law*, the

defendants indicated that they would talk, but only after a subsequent condition had been met. In *Law* the condition was further treatment. Here the condition was a meeting with defendant's father. The implied intent to talk later does not change the fact, as the court found in *Law* and as we find here, that defendant sought to terminate the interrogation.

The importance of the police's failure to reissue *Miranda* warnings after defendant had met his father is clearly shown by what happened when the police finally did give him the warnings. After defendant had confessed orally, the authorities gave him new *Miranda* warnings before seeking to take a formal statement. Defendant immediately demanded an attorney before any statement could be reduced to writing. It is no stretch to imagine that defendant would have requested an attorney had the police given him warnings when they first interrogated him after he had met with his father.

The mandate of *State v. Hartley, supra,* 103 *N.J.* 252, 511 *A.*2d 80, is clear. When a defendant seeks to terminate an interrogation, the police must at a minimum give fresh *Miranda* warnings before recommencing questioning. *Id.* at 256, 511 *A.*2d 80. Any statement made prior to the new warnings must be suppressed. We pause to observe that although our dissenting colleague Justice Stein readily acknowledges that "defendant asserted his right to cut off questioning," *post* at 444, 581 *A.*2d at 501, nevertheless he concludes—contrary to the unmistakable language of *Hartley*'s "bright line" rule, see 103 *N.J.* at 267, 511 *A.*2d 80—that "the resumption of interrogation [thereafter] did not constitute a failure by the police to 'scrupulously honor' defendant's right to remain silent." *Post* at 444, 581 *A.*2d at 501. Either defendant exercised his right (as we and Justice Stein conclude), or he did not (as Justice O'Hern concludes). If he did, then without question *Hartley* requires the readministering of *Miranda* warnings before the resumption of interrogation.

We apply the *Hartley* rule even though that rule was announced after the interrogation in this case had occurred. Retroactivity is not a consideration here. "The threshold question in any retroactivity decision is whether a new rule of law has actually been announced." *State v. Burstein*, 85 *N.J.* 394, 403, 427 *A.*2d 525 (1981). The issue of retroactivity "never arises absent a new rule of law * * *." *State v. Lark*, 117 *N.J.* 331, 344, 567 *A.*2d 197 (1989) (Clifford, J., concurring in judgment).

*Hartley* did not announce a new rule of law. It was "not a clear break with the past, but a simple extension of the principle of cases * * * holding that the State must honor 'a defendant's request—however ambiguous—to terminate interrogation.'" *Bey II, supra*, 112 *N.J.* at 213, 548 *A.*2d 887 (Handler, J., dissenting) (quoting *State v. Kennedy*, 97 *N.J.* 278, 288, 478 *A.*2d 723 (1984)). We said that our rule in *Hartley* was "sound as a matter of New Jersey common law [and] consistent with the spirit of the Supreme Court's decisions * * *." *State v. Hartley, supra*, 103 *N.J.* at 268, 511 *A.*2d 80. The foundation of our decision was *Michigan v. Mosley, supra*, 423 *U.S.* 96, 96 *S.Ct.* 321, 46 *L.Ed.*2d 313, in which the Supreme Court held that the police had "scrupulously honored" the defendant's decision to remain silent because they did not approach him for two hours, they gave him fresh *Miranda* warnings, a different officer questioned him, and the questioning concerned a different offense from the one for which he was in custody. Although the Supreme Court did not indicate which of those elements are essential for a finding that the police "scrupulously honored" a suspect's rights, we held that the furnishing of fresh *Miranda* warnings is "indispensable." *State v. Hartley, supra*, 103 *N.J.* at 267, 511 *A.*2d 80.

In reaching that conclusion, we relied on the decisions of other courts as well as academic literature. See, *e.g., Wilson v. United States*, 444 *A.*2d 25, 31 (D.C.1982) (all *Mosley* factors are required to validate reinterrogation); *People v. Young*, 115 *Ill.App.*3d 455, 71 *Ill.Dec.* 259, 450 *N.E.*2d 947 (1983) (recess

and fresh *Miranda* warnings are a minimum prerequisite to reinterrogation); Kamisar, "The *Edwards* and *Bradshaw* Cases: The Court Giveth and the Court Taketh Away," 5 *The Supreme Court: Trends and Developments 1982–83* 153 (1984) (fresh *Miranda* warnings are necessary for renewing questioning after suspect has indicated desire to remain silent).

Because *Hartley* did not announce a new rule of law, retroactivity is not an issue. Any defendant who had not exhausted direct appeals when *Hartley* was decided could have asserted a claim based on that opinion. Because the police did not give defendant fresh *Miranda* warnings after he had indicated his desire to remain silent, *Hartley* requires that the ensuing confession be suppressed.

■ Moreover, even if *Hartley* did create a new rule of law, it would still apply here under *either* the Supreme Court's old analysis of retroactivity of new criminal procedure rules or its more recent pronouncement on retroactivity in *Griffith v. Kentucky*, 479 *U.S.* 314, 107 *S.Ct.* 708, 93 *L.Ed.*2d 649 (1987). Under its former analysis, the Supreme Court held that *Miranda* itself applies to interrogations that took place before that rule was announced if the trial did not commence until after the *Miranda* decision (precisely the sequence in this case), see *Michigan v. Tucker*, 417 *U.S.* 433, 447, 94 *S.Ct.* 2357, 2365, 41 *L.Ed.*2d 182, 195 (1974), but not if the case was tried before that decision, *Johnson v. New Jersey*, 384 *U.S.* 719, 733, 86 *S.Ct.* 1772, 1781, 16 *L.Ed.*2d 882, 892 (1966). The obvious similarity between the nature and effect of *Miranda* and *Hartley* suggests that the application of *Hartley* should be no less broad.

Turning to the Supreme Court's most recent retroactivity pronouncements, we note first that Justice Stein correctly points out, *post* at 439, 581 *A.*2d at 499, that " '[t]o the extent that retroactivity issues arise in the context of criminal-procedure decisions implicating rights guaranteed under the federal constitution, United States Supreme Court precedents control

the scope of retroactivity,'" (citing *State v. Lark, supra,* 117 *N.J.* at 335, 567 *A.*2d 197 (1989), and that under *Griffith v. Kentucky,* 479 *U.S.* 314, 107 *S.Ct.* 708, 93 *L.Ed.*2d 649 (1987), "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." 479 *U.S.* at 328, 107 *S.Ct.* at 716, 93 *L.Ed.*2d at 661; *see State v. Stever,* 107 *N.J.* 543, 548–53, 527 *A.*2d 408 (1987) (discussing Supreme Court's development of retroactivity principles). Clearly, then, *Griffith* mandates adherence to a *Hartley* analysis in this case. Justice Stein would avoid application of *Griffith*'s sound principle, however, on the ground that *Hartley* was not based "primarily" on federal-constitutional law, *post* at 425, 581 *A.*2d 491. Whatever "primarily" means in the foregoing context, our distinguished colleague is quite wrong.

First, it is abundantly clear that *Hartley* was grounded at least as much on the fifth amendment to the United States Constitution as it was on New Jersey's common-law privilege, codified in our Evidence Rules. No fewer than sixteen times does the opinion refer specifically to its "constitutional" basis. For example, we emphasized at the outset of *Hartley* that our decision was founded not only on state law but "on our understanding of the United States Supreme Court precedents in this area." *State v. Hartley, supra,* 103 *N.J.* at 256, 511 *A.*2d 80. And: "[T]he failure to readminister *Miranda* warnings was a violation of the obligation scrupulously to honor Hartley's asserted right to silence, and therefore amounted to a violation of defendant's fifth-amendment and state common-law right not to be compelled to be a witness against himself." *Id.* at 278, 511 *A.*2d 80. And: any statement obtained in violation of *Hartley*'s "bright-line" rule is "unconstitutionally compelled, and hence inadmissible, as having been obtained in violation of the fifth amendment and of the state common-law right against self-incrimination." *Id.* at 279, 511 *A.*2d 80. And finally: "[T]he failure scrupulously to honor Hartley's previously-in-

voked right to silence was a violation of constitutional magnitude * * *." *Id.* at 283, 511 *A.*2d 80.

Second, one need look no further than Justice Stein's own opinion for the Court in *Bey I, supra,* 112 *N.J.* 45, 548 *A.*2d 846, for confirmation of the federal-constitutional basis of *Hartley:* "As in *Hartley* * * * we base our analysis [of whether the police had scrupulously honored Bey's right to cut off questioning] on both federal constitutional law and our State common-law privilege against self-incrimination." *Id.* at 63, 548 *A.*2d 846 (citing *Hartley, supra,* 103 *N.J.* at 284, 511 *A.*2d 80). And: "*Hartley* held that where the failure scrupulously to honor a suspect's right to cut off questioning results from the absence of fresh *Miranda* warnings before resuming questioning, the illegality renders the suspect's subsequent inculpatory statement *unconstitutionally* compelled as a matter of law." *Id.* at 71, 548 *A.*2d 846 (emphasis added).

Note too that in *Bey* the interrogation occurred in May 1983 and the trial court heard the motion to suppress Bey's confession late in that same year. This Court decided *Hartley* in July 1986 and *Bey I* more than two years later, in August 1988. In *Bey I* we simply applied *Hartley* to a case that had been on direct appeal when *Hartley* was decided. See *id.* at 58–74, 548 *A.*2d 846. Likewise, in *Bey II, supra,* 112 *N.J.* 123, 548 *A.*2d 887, this Court engaged in a full discussion of the *Hartley* principle, see *id.* at 134–43, 548 *A.*2d 887, prompting two dissents on the issue of the admissibility of the defendant's confession under a *Hartley* analysis, see *id.* at 184–88, 548 *A.*2d 887. There was no necessity to discuss or rule on any question of *Hartley*'s retroactivity, because the Court assumed, again correctly, its applicability. No more was it an issue there than it is here. And if *Hartley* applied in the *Bey* cases, on appeal when *Hartley* was decided, *a fortiori* it applies when, as here, the trial began after the *Hartley* opinion had been published.

Finally, Justice Stein overestimates *Hartley*'s impact ("a multitude of post-conviction-relief applications," *post* at 442, 581 *A*.2d at 500), on cases such as this, which were tried after *Hartley* had been decided. *Griffith* would limit retroactive application to cases "in the pipeline"—those on appeal when *Hartley* was decided, in which the *Hartley* point had been raised—and would not affect cases that had gone to final decision before *Hartley*. We suspect the number is minimal; and in any event the burden is not more than the criminal-justice system should be asked to bear.

We hold that the *Hartley* rule bars the introduction of defendant's confession at retrial. We need not consider defendant's claim that his confession was involuntary.

—B—

■ Defendant objects to two statements made by the prosecutor during his opening. After describing the murder of Schnaps, the prosecutor told the jury:

So, as you can see, this is a very important trial. It's important for Nathaniel Harvey. It's important for the family of the victim, and it's important to each and every citizen.

Later the prosecutor observed that Schnaps "was a recent widow, her husband having died six weeks * * * previously."

The prosecutor's comments were improper. They drew attention not to issues relevant to the crime charged but to the status of the victim and her family. His reference to her recent widowhood was "plainly designed to impassion the jury" and " 'contain[ed] nothing that would aid the jury in determining the defendant's guilt or innocence.' " *State v. Hightower*, 120 *N.J.* 378, 411, 577 *A*.2d 99 (1990) (quoting *State v. Williams*, 113 *N.J.* 393, 452, 550 *A*.2d 1172 (1988)). On retrial the prosecutor must refrain from making such comments.

—C—

Defendant makes several objections to the testimony of four of the State's expert witnesses.

—1—

First, defendant argues that the trial court should not have qualified Dr. Claude Owen Lovejoy as an expert to testify about the bloody sneaker print found on the pillowcase. Dr. Lovejoy, a professor at Kent State University, received a doctorate in biological anthropology, which according to him is "the study of human form and function, evolution of the human species, human variation involving anatomy, genetics, essentially the normal biology of man." His specialty is "the form and function and biomechanics of the lower limb." He claims to be able to estimate the stature of a person from the size of his or her shoes.

In October 1985 the police sent Dr. Lovejoy four photographs of the pillowcase containing a sneaker print. After having examined the pictures, Dr. Lovejoy concluded that the bloody print had been left by either a male of "short stature" or a female of "average to medium tall stature." The police then sent Dr. Lovejoy the actual pillowcase and three pairs of Pony hightop sneakers, marked in evidence as S–58, S–59, and S–60, two of which they said belonged to defendant's son. The professor immediately decided that neither S–59 nor S–60 had left the print, but he was unsure about S–58. He then made a print with S–58 on a pillowcase stuffed with a pillow. Comparing that print to the one on Schnaps' pillowcase, Dr. Lovejoy concluded that it was "improbable" that S–58 had left the print.

The Pony Sneaker Company sent Dr. Lovejoy thirty-one pairs of sneakers from the same manufacturing run as S–58. The sneakers ranged in size from 7 to 11; none was 6, 6½, or 7½. The doctor took three measurements of the sole of each sneaker and plugged them into his "digitizer" to determine the size of the shoe that had left the print:

> Okay, what we did was we took * * * each of the individual shoes in the Pony sample, measured each of the dimensions that I've just talked about, put those into a data base, into a computer, along with shoe size and determined the relationship between those using a variety of statistical techniques.

> The simplest of those is called linear correlation and if one puts a set of dimensions, two sets of dimensions from the same object into the computer it will determine the degree of relationship between them, it will give you for example, the ability of one metric to predict the other with certain limits of reliability and that's what we mean by correlation and the strength of that physical relationship is expressed as varying from minus one through zero to plus one plus one being a perfect positive relationship, minus one being a perfect negative relationship.

Based on that analysis, Dr. Lovejoy concluded that the sneaker that had made the print was either a man's size 6½, plus or minus one-half size, or a woman's size 8 to 8½. The confidence limit of that conclusion was 95%, *i.e.*, the conclusion would be accurate within a one-half size 95% of the time. Deciding that hightop and lowtop sneakers have decorative stripes on different portions of the outer sole, he concluded that the sneaker was a hightop.

 There are three requirements for the admission of expert testimony:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
> [*State v. Kelly*, 97 *N.J.* 178, 208, 478 *A.*2d 364 (1984).]

Comparison between a shoe print and the shoe alleged to have made that print does not require expert testimony. *State v. Johnson*, 120 *N.J.* 263, 293–94, 576 A.2d 834 (1990). Nor is the proposition that shorter people tend to have smaller feet the stuff of expert testimony. It would be improper to use Dr. Lovejoy's professed expertise to bolster such testimony. However, to the extent that Dr. Lovejoy sought to establish with scientific reliability the size of the shoe and the height of the person that left the print, expert testimony was proper.

 Concerning the second requirement for the admission of Dr. Lovejoy's expert testimony, there are three ways, in a relatively new field of research, to prove the evidence's "general acceptance and thereby its reliability":

> (1) by expert testimony as to the general acceptance, among those in the profession, of the premises on which the proffered expert witness based his or her analysis; (2) by authoritative scientific and legal writings indicating that the

scientific community accepts the premises underlying the proffered testimony; and (3) by·judicial opinions that indicate the expert's premises have gained general acceptance. [*State v. Kelly, supra,* 97 *N.J.* at 210, 478 *A.*2d 364.]

The State did not satisfy either the first or second alternative. It did not provide evidence that anyone in the scientific community other than Dr. Lovejoy himself vouches for his methods.

Nor do judicial opinions indicate that Dr. Lovejoy's methods have gained general acceptance. In *State v. Prudden,* 212 *N.J.Super.* 608, 515 *A.*2d 1260 (App.Div.1986), the same trial court that presided over these proceedings had qualified Dr. Lovejoy as an expert to testify about a sock print. Reversing on other grounds, the Appellate Division expressed reservations about the reliability of Dr. Lovejoy's methods. *Id.* at 617–18, 515 *A.*2d 1260. Dr. Lovejoy also testified in *United States v. Ferri,* 778 *F.*2d 985 (3d Cir.1985), *cert. denied,* 476 *U.S.* 1172, 106 *S.Ct.* 2896, 90 *L.Ed.*2d 983 (1986), to rebut the testimony of the government's footprint expert, who had compared one defendant's footprints with impressions inside shoes found at the crime scene and inside shoes seized from the defendants' residences. Notwithstanding *Prudden* and *Ferri,* we are unaware of any cases in which an expert's testimony involved the scientific comparison of sneaker prints with stature.

We also note several glaring weaknesses that cast doubt on the reliability of Dr. Lovejoy's conclusions. He admitted that he knew nothing about sneaker manufacturing or about the extent of variations from manufacturer to manufacturer or plant to plant. According to defendant, a Pony representative reported that the sneaker print had not even been made by a Pony. In conducting his analysis, Dr. Lovejoy used sneakers only from the same production series as that of S–58. Yet he had already determined that S–58 had not made the print. Nor was there any showing that the thirty-one pairs he measured were representative of the production run. Moreover, although he concluded within a 95% confidence limit that the shoe that

had left the print was size 6½, every shoe he examined from that production run was at least a size 7.

Because Dr. Lovejoy's methodology was not of sufficient scientific reliability, we need not consider the third requirement of whether he had sufficient expertise in the field. On retrial Dr. Lovejoy may not testify as an expert.

—2—

■ Theodore Mozer, a forensic chemist, testified as an expert on hair comparison. Mozer has worked for the New Jersey State Police for over fifteen years as a principal forensic chemist specializing in the analysis of human hairs in assault and homicide cases. He received a B.S. in biology and took graduate courses in chemistry. Mozer also took courses in the microscopy of human hair at the F.B.I. Academy in Virginia. A member of the International Committee on Hair Comparison, Mozer has examined hair samples in over 1,000 criminal cases and has testified as an expert in hair comparison between fifty and one-hundred times.

After analyzing seventy-five hairs found at the murder scene, Mozer determined that one of them was a black person's pubic hair that did not match Schnaps' hair. Comparing a hair sample from defendant, Mozer concluded that the hair had come either from defendant or from "[a]nother individual who had [the] same microscopic characteristics."

According to defendant, Mozer was not qualified on that subject because he was unfamiliar with a purported standard in the science of hair comparison that an expert must find fifteen to twenty similar characteristics before an opinion can be deemed reliable. See, *e.g., People v. Allweiss,* 48 *N.Y.*2d 40, 49, 421 *N.Y.S.*2d 341, 346, 396 *N.E.*2d 735, 740 (1979), and *People v. Watkins,* 78 *Mich.App.* 89, 93–96, 259 *N.W.*2d 381, 384–85 (1977). At the *Rule* 8 hearing, Mozer admitted that he was unaware of such a standard but explained that the technique he used included analyzing "hundreds of different characteristics of these two hairs side by side and seeing whether or not they

compare." Given Mozer's extensive experience in hair comparison, as established at the *Rule* 8 hearing, the trial court did not abuse its discretion in admitting him as an expert.

██ Defendant also claims that the State should not have been allowed to refer to the hair as a "pubic hair" because it conjures images of a sexual assault. We agree that the fact that the hair is a pubic hair is not relevant in this case. The important fact is that the hair might have come from defendant. Whether it might have come from his head, his chest, or his pubis is irrelevant in the absence of allegations of a sexual encounter. On retrial the prosecution should refrain from referring to the hair as a "pubic hair."

—3—

██ Defendant challenges the trial court's ruling that Philip Beesley was qualified to render an opinion regarding the percentage of blacks with a certain genetic marker in their blood. Beesley, an expert in forensic serology, analyzed four blood stains from Schnaps' apartment that did not match the victim's blood but did match defendant's. He found that the four stains and a sample of defendant's blood all contained enzyme CAII, which is present only in blacks. Beesley testified that only 17.5% of the black population have CAII.

Defendant contends that Beesley was unqualified to testify about the percentage of the population that has CAII. In reaching that figure, Beesley relied in part on a State study of 337 blood samples taken from blacks. The study concluded that 17.5% of the black population in New Jersey have CAII. Beesley had not participated in that study and did not know how it had been conducted. Nor has that study ever been published and subjected to scientific scrutiny. His only basis for vouching for the study's reliability was that "[t]he person who did perform all that analysis and all that data knows a lot about statistics * * *." The in-house study was an insufficient ground for Beesley to testify about the 17.5% figure.

Beesley, however, also relied on the *Source Book of Forensic Serology,* which states that CAII exists in 17.5% of blacks. If on retrial the State can show that that book and figure are considered authoritative in the forensic-serology community, it can introduce the figure through Beesley. *See Evid.R.* 56(2); *Mauro v. Owens–Corning Fiberglas,* 225 *N.J.Super.* 196, 206, 542 *A.*2d 16 (App.Div.1988) (expert could testify about statistical data " 'of a type reasonably relied upon by experts' in the field of pulmonary disorder"), *aff'd sub nom. Mauro v. Raymark Indus.,* 116 *N.J.* 126, 561 *A.*2d 257 (1989).

 Defendant also claims that the jury's consideration of statistical evidence quantified reasonable doubt and usurped its function of weighing the evidence. The argument is without merit. *See State v. King,* 215 *N.J.Super.* 504, 520, 522 *A.*2d 455 (App.Div.1987) ("[s]imply because [a] figure is rather high is no reason to exclude it if the test procedure is a valid one").

—4—

 Defendant contends that Dr. Shuster, who had conducted the autopsy of the victim, improperly testified about opinions that were not based on a reasonable degree of medical certainty or probability. For example, Dr. Shuster testified that the skull injury was "possibly" two wounds or "possibly not." We need not delve into each part of Dr. Shuster's testimony. We merely instruct the trial court that on remand Dr. Shuster's ultimate "[m]edical expert testimony 'must be couched in terms of reasonable medical certainty or probability; opinions as to possibility are inadmissible.' " *State v. Freeman,* 223 *N.J.Super.* 92, 116, 538 *A.*2d 371 (App.Div.1988) (quoting *Johnesee v. Stop & Shop Co.,* 174 *N.J.Super.* 426, 431, 416 *A.*2d 956 (App.Div.1980)).

—D—

 The trial court conducted a hearing to determine whether the State could impeach defendant's credibility with a prior

conviction. The hearing centered on defendant's 1979 four-count conviction arising from a rape. Defendant was sentenced to a prison term of fifteen to twenty years. The record does not indicate when he was released. The trial court allowed the State to use the conviction for impeachment.

"The well-established rule in this jurisdiction is that admission of a prior conviction 'into evidence against a criminal defendant rests within the sound discretion of the trial judge.'" *State v. Pennington,* 119 *N.J.* 547, 586, 575 *A.*2d 816 (1990) (quoting *State v. Sands,* 76 *N.J.* 127, 144, 386 *A.*2d 378 (1978)). The defendant has the burden of showing that the conviction should be excluded. *Ibid.* "The key to exclusion is remoteness." *State v. Sands, supra,* 76 *N.J.* at 144, 386 *A.*2d 378.

The trial court here did not abuse its discretion in permitting the use of defendant's conviction for impeachment purposes. The conviction was only seven years old. Moreover, because defendant had been sentenced to a prison term of fifteen to twenty years, at the time of trial he must have been out of prison for less than seven years. Given the seriousness of his prior offenses, we see no reason to second-guess the trial court.

—E—

Defendant contends that the trial court improperly admitted sixty color photographs of the murder scene and of the victim's body. We do not rule on that challenge here but alert the trial court on remand to the standards set forth in *State v. Thompson,* 59 *N.J.* 396, 283 *A.*2d 513 (1971), and discussed in *State v. Johnson, supra,* 120 *N.J.* at 296–299, 576 *A.*2d 834, *State v. Moore,* 113 *N.J.* 239, 295–97, 550 *A.*2d 117 (1988), *State v. Rose,* 112 *N.J.* 454, 533–36, 548 *A.*2d 1058 (1988), and *Bey II, supra,* 112 *N.J.* at 181–83, 548 *A.*2d 846.

—F—

 Peggy Stevens testified that someone had stolen perfume and a camera from her house about a week before the

murder of Schnaps. Several months later she had reported that a hatchet had been stolen. Because her family had used the hatchet only during the fall and winter, she did not know how long it had been missing. When the police searched defendant's car, they found the camera and undeveloped photographs of Stevens' family.

At a *Rule* 8 hearing the State argued that Stevens' testimony established defendant's identity, showed his intent, and corroborated his confession, in which he had admitted having stolen a "hammer-like" instrument from someone's garage a week before the murder. Defendant countered that Stevens' testimony was inadmissible "other crimes" evidence because she could not state when she had last seen the hatchet and because her testimony did not prove that defendant had stolen it.

Evidence of "other crimes" is not admissible to prove a person's disposition to commit crime but is admissible "to prove some other fact in issue including motive, intent, plan, knowledge, identity, or absence of mistake or accident." *Evid.R.* 55. The State bears the burden of proving other crimes by clear and convincing evidence. *State v. Stevens,* 222 *N.J.Super.* 602, 614, 537 *A.2d* 774 (App.Div.1988), *aff'd,* 115 *N.J.* 289, 558 *A.2d* 833 (1989).

Although the trial court admitted the evidence at first for "the issues of identification, state of mind, purposefully or knowingly, type of instrument used, presence of the defendant at the scene, [and] corroboration of [defendant's] confession," its jury instructions limited consideration of the evidence to the issue of identification.

Defendant argues that the testimony was inadmissible at the guilt phase because the State did not prove by clear and convincing evidence that defendant had stolen the items. The State, however, did provide substantial evidence of that allegation. The Stevens family had reported their camera as stolen about a week before the murder. The police had found the camera and film in the trunk of defendant's car. Defendant

had confessed to having stolen a "hammer-like" object from a garage shortly before Schnaps' death. The trial court did not abuse its discretion in allowing Stevens' testimony. However, because we have determined that defendant's confession must be suppressed, the trial court should reconsider the issue in light of the remaining evidence.

The State contends that the trial court should have allowed the jury to consider Stevens' testimony not only for identification but also as evidence of defendant's purposeful intent. We see no basis for finding that the trial court abused its discretion in limiting admissibility to the issue of identification.

Defendant also argues that even if Stevens' testimony is admissible at the guilt phase, it should not be admitted at the penalty phase. In the penalty phase the State "is restricted to proving the statutory aggravating factors and rebutting proof of mitigating factors." *State v. Rose, supra,* 112 *N.J.* at 503, 548 *A.*2d 1058. The State asserts that Stevens' testimony is relevant to aggravating factor c(4)(c) as showing that "defendant armed himself with a weapon capable of inflicting pain and suffering in addition to death." The testimony is not admissible at the penalty phase for that purpose. The fact that defendant may have stolen a hatchet from the Stevenses is not relevant to c(4)(c). What matters is whether he used that weapon to inflict pain and suffering on the victim. Stevens' testimony is not relevant to that question. However, her testimony might be relevant to the issue of intent under c(4)(c). If the State proposes to show that defendant stole the hatchet for the purpose of inflicting pain and suffering on a future murder victim, Stevens' testimony might be admissible. Otherwise, if defendant is convicted of capital murder on remand, the trial court should not admit her testimony at the penalty phase.

—G—

Defendant alleges a number of penalty-phase errors involving jury instructions that did not conform to our holdings in

subsequent capital cases. We need not consider those claims now. If there is a new penalty phase on remand, the trial court should heed those opinions in formulating its instructions.

Defendant also contends that the evidence does not support a finding of aggravating circumstance c(4)(c), that the murder was wantonly vile, horrible, or inhumane. The State argues that the murder of Schnaps falls into the category of c(4)(c) murders in which the perpetrator "intended to cause, and did in fact cause, severe physical or psychological pain or suffering to the victim prior to the victim's death." *State v. Ramseur*, 106 *N.J.* 123, 211, 524 *A.*2d 188 (1987). The State claims that defendant initially struck Schnaps in the head with the hatchet to cause her severe physical pain and suffering prior to her death. Only later did he strike the fatal blows. The State further argues that there was evidence of post-death mutilation of the body that indicates depravity of mind.

Because the trial occurred before our opinion in *Ramseur*, the trial court did not analyze the evidence under our narrowed construction of c(4)(c). Given the factual nature of that issue, we will not pass on it without the trial court's having had the opportunity to evaluate the evidence. *See State v. Hightower supra*, 120 *N.J.* at 420, 577 *A.*2d 99.

—IV—

Defendant's capital-murder conviction is reversed. The cause is remanded for a new trial.

O'HERN, Justice, concurring and dissenting in part.

I concur in the opinion and judgment of the majority, except to the extent that it invalidates defendant's confession.

This case is far removed from our recent confession case of *State v. [Walter] Johnson*, 120 *N.J.* 263, 576 *A.*2d 834 (1990). In that case the Court found the defendant's privilege against self-incrimination had been violated, but under circumstances in which "defendant repeatedly responded to questions by saying,

'I can't talk about it.'" *Id.* at 284, 576 *A.*2d 834. Such repeated refusals had to create an ambiguity about whether he had thereby expressed a "desire to cut off questioning." *Ibid.* We noted that "[d]efendant's reluctance to answer questions was not confined to an isolated ambiguous remark. He persisted, for well over an hour, in a pattern of prolonged silences and unresponsiveness, refusing to answer any and all questions about the * * * murders." *Id.* at 284, 576 *A.*2d 834. In the face of that kind of record we could conclude only that defendant's right to remain silent had been violated by the persistent renewal of questioning.

Nonetheless, in this case there is no ambiguity about what defendant said. He quite simply said, "I'll tell you about the murder, but first I want to see my father." Defendant's brief recites that "they stopped talking to him" and arranged for Harvey's father to be brought to the jail. Although defendant claims that he told his father that he did not commit the murder in question and that he had been struck by the police, there is no evidence that Harvey's father, much less Harvey, asked that the questioning cease after the father and son had met. It took some time for the police to arrange for defendant's father to be brought to the station house, but that ought not make the interruption qualitatively different from an interruption for food, rest, or other requests.

Here, as in the fourth-amendment context, there is no "litmus-paper test" of constitutionality. *See Florida v. Royer,* 460 *U.S.* 491, 506, 103 *S.Ct.* 1319, 1329, 75 *L.Ed.*2d 229, 242 (1983). After all, the warnings in *State v. Hartley,* 103 *N.J.* 252, 511 *A.*2d 80 (1986), do not necessarily guarantee that a constitutional violation will not occur. Were the *Hartley* admonition all that there were to the constitutional obligation, interrogators might continue to question suspects indefinitely by repeated recitations of the *Miranda* warnings. Rather, the question is whether the suspect has at least ambiguously invoked his right to remain silent or to request that questioning cease. In that regard, the confession obtained in *State v. Bey II,* 112 *N.J.* 123,

548 *A*.2d 887 (1988), provides guidance. There, the defendant claimed that his request to lie down and "think about what happened" was an invocation of his right to cut off questioning, and that the police failed to "scrupulously honor" his right by resuming interrogation without reissuing a *Miranda* warning after his one hour of rest. In rejecting defendant's argument, the Court observed that any reasonable police officer could not have construed the statement as an assertion of his right to remain silent:

> Defendant merely communicated his desire to spend some time thinking about the events that were the subject of the interrogation. He did not ask for an attorney or refuse to sign a waiver of his rights. Similarly, he did not refuse to continue the questioning, and did not indicate in any manner that he wanted to end the interrogation. Not every break in questioning compels renewed administration of the *Miranda* warnings. Otherwise, police would be obliged to administer these warnings each time a defendant requested or was offered something to eat or drink, the use of toilet facilities, the opportunity to stand and stretch, or, as here, time to lie down. [*Id.* at 138–39, 548 *A*.2d 887.]

Harvey did not ask that questioning should end. A contrasting case is *State v. Bey I*, 112 *N.J.* 45, 64, 548 *A*.2d 846 (1988), in which the defendant told the police that "he did not want to talk to [them] about [the victim]." As noted, in this case Harvey specifically told the police that he would tell them about the murder, but first he wanted to see his father. How could the police have concluded in the face of defendant's willingness to continue testifying after he had seen his father that his request was anything other than what it appeared to be on its face? After all, this was not a case of a single set of warnings and desultory questioning. Recall that this was an evolving investigation into a series of burglaries that occurred in the vicinity of West Windsor; therefore, it was not surprising that the questioning had to continue over an extended period of time.

In short, the defendant never invoked his right to silence in the first place, wherefore *Hartley* is not triggered. Were I to conclude, as does the majority, that the defendant had requested that questioning cease, I would agree that we would then have to consider the retroactive application of *Hartley* in lieu of

the totality of circumstances test suggested by Justice Stein in his separate opinion.

STEIN, Justice, concurring in part and dissenting in part.

Except for its conclusion that our decision in *State v. Hartley*, 103 *N.J.* 252, 511 *A.*2d 80 (1986), must be applied retroactively to police interrogations that occurred before the *Hartley* opinion had been published, I join in the opinion of the majority. I write separately to emphasize and explain my disagreement with the Court's holding concerning *Hartley*'s retroactive application. I find that *Hartley*'s purpose to "avoid * * * confusion and conflict in future cases, * * * on the question of the *minimum* requirement for 'scrupulously honoring' [the right to silence]," *id.* at 268, 511 *A.*2d 80, and its recognition of "[t]he necessity for our giving guidance to our own law-enforcement officials * * *," *id.* at 285, 511 *A.*2d 80, are irreconcilable with today's holding that *Hartley* must be applied to invalidate confessions elicited by interrogations conducted *before* law-enforcement officials learned of *Hartley*'s bright-line rule requiring mandatory rewarning whenever a suspect asserts a right to silence. The result of applying *Hartley* to the interrogation in this case, in the course of which police officers administered *Miranda* warnings to defendant on *seven* separate occasions between his arrest and confession, highlights the anomaly of the Court's determination to accord *Hartley* full retroactivity.

## I.

In *State v. Hartley,* this Court held that

before an accused's previously-asserted right to remain silent may be deemed to have been "scrupulously honored," law-enforcement authorities must, at a minimum, readminister the *Miranda* warnings. In the absence of those renewed warnings any inculpatory statement given in response to police-initiated custodial interrogation after the right to silence has been invoked is inadmissible. [*Id.*, 103 *N.J.* at 256, 511 *A.*2d 80.]

The Court based its decision "not only on our understanding of federal constitutional law, but on our state common-law

privilege against self-incrimination as well." *Id.* at 284, 511 A.2d 80. It acknowledged, however, that the United States Supreme Court had not yet ruled on the issue, and that its prediction concerning how that Court would rule, if confronted with the *Hartley* question, might be incorrect:

> In respect of federal constitutional law, therefore, ours is a predictive exercise, one conducted on the basis of our best understanding of the authorities, but nonetheless predictive. We think our reading of the federal law is right. We acknowledge that it may be wrong. Given the importance of the question involved, we see our duty to settle it as a matter of state law. [*Id.* at 284–85, 511 A.2d 80.]

Whether *Hartley* is based primarily on federal constitutional law or state law is critical to the question of its retroactive application. As we acknowledged in *State v. Lark*, 117 *N.J.* 331, 567 A.2d 197 (1989),

> [t]o the extent that retroactivity issues arise in the context of criminal-procedure decisions implicating rights guaranteed under the federal constitution, United States Supreme Court precedents control the scope of retroactivity. [*Id.* at 335, 567 A.2d 197 (citation omitted).]

In *Griffith v. Kentucky*, 479 *U.S.* 314, 107 *S.Ct.* 708, 93 *L.Ed.*2d 649 (1987), the Supreme Court held that new constitutional rules of criminal procedure apply retroactively to cases pending on direct review, whether or not the rule constitutes a "clean break" with the past. *Id.* at 328, 107 *S.Ct.* at 716, 93 *L.Ed.*2d at 661. Thus, if our holding in *Hartley* is rooted primarily in federal constitutional law, its retroactive application to cases on direct appeal is mandated by *Griffith*.

Particularly because our holding in *Hartley* purports merely to predict federal constitutional law, it would be realistic to consider *Hartley* as based primarily on state law. Although decided in 1986, *Hartley*'s holding has yet to be adopted by the Supreme Court, and several federal courts had previously decided confession cases in a manner inconsistent with Hartley's bright-line rule. See *Stumes v. Solem*, 752 *F.*2d 317, 321 (8th Cir.1985) ("[W]e believe that Stumes was aware of his *Miranda* rights and voluntarily chose not to exercise them. To require the police to reissue *Miranda* rights under these circumstances would serve no real purpose."), *cert. denied*, 471 *U.S.* 1067, 105

*S.Ct.* 2145, 85 *L.Ed.*2d 502 (1985); *Jarrell v. Balkcom,* 735 *F.*2d 1242, 1254 ("We conclude that no violation of petitioner's rights occurred by the failure to reissue the *Miranda* warnings * * *."), *reh'g denied,* 740 *F.*2d 979 (11th Cir.1984), and *cert. denied,* 471 *U.S.* 1103, 105 *S.Ct.* 2331, 85 *L.Ed.*2d 848 (1985); *United States v. Hackley,* 636 *F.*2d 493, 500, 504–05 (D.C.Cir. 1980) (third set of *Miranda* warnings not required and statement made two hours after last warnings held admissible; dissenting opinion views colloquy with accused as reinterrogation); *Brown v. Tard,* 552 *F.Supp.* 1341, 1349 (D.N.J.1982) (*"Miranda* does not require that a fresh set of warnings be repeated each time the police resume interrogation after an interruption."); *see also Miller v. United States,* 396 *F.*2d 492, 496 (8th Cir.1968) (rewarning not required each time interrogation process renewed), *cert. denied,* 393 *U.S.* 1031, 89 *S.Ct.* 643, 21 *L.Ed.*2d 574 (1969); *United States v. Kinsey,* 352 *F.Supp.* 1176, 1178 (E.D.Pa.1972) (*Miranda* warnings do not become stale).

Because *Hartley* 's federal constitutional underpinning is questionable, and because there is no doubt about the availability of state common law as a source of *Hartley*'s bright-line rule, it is appropriate that the issue of *Hartley* 's retroactivity be determined by state standards. *Cf. State v. Lark, supra,* 117 *N.J.* 331, 335, 567 *A.*2d 197 (retroactivity of *State v. Howard,* 110 *N.J.* 113, 539 *A.*2d 1203 (1988), determined by state law, although *Howard* collaterally implicates federal constitutional rights).

In *State v. Burstein,* 85 *N.J.* 394, 427 *A.*2d 525 (1981), we summarized the options available in determining the retroactive application of our decisions:

> [W]e note that this Court has four options open to it in any decision involving retroactivity: (1) make the new rule of law purely prospective, applying it only to cases whose operative facts arise after the new rule is announced; (2) apply the new rule to future cases and to the parties in the case announcing the new rule, while applying the old rule to all other pending and past litigation; (3) grant the new rule limited retroactivity, applying it to cases in (1) and (2) as well as to pending cases where the parties have not yet exhausted all avenues

of direct review; and, finally, (4) give the new rule complete retroactive effect, applying it to all cases, even those where final judgments have been entered and all avenues of direct review exhausted. [*Id.* at 402–03, 427 *A*.2d 525 (citation omitted).]

Our choice among those four options has been informed generally by weighing

(1) the purpose of the rule and whether it would be furthered by a retroactive application, (2) the degree of reliance placed on the old rule by those who administered it, and (3) the effect a retroactive application would have on the administration of justice. [*State v. Nash*, 64 *N.J.* 464, 471, 317 *A*.2d 689 (1974).]

All three of the *Nash* factors counsel against retroactive application of *Hartley*. To the extent that the purpose of *Hartley* is to give "guidance to our own law-enforcement officials," 103 *N.J.* at 285, 511 *A*.2d 80, and "avoid * * * confusion and conflict in future cases," *id.* at 268, 511 *A*.2d 80, retroactive application is a *non sequitur*. Applying the second *Nash* factor, the degree of reliance placed on the pre-*Hartley* law requiring *Miranda* warnings before custodial interrogation, and mandating that law-enforcement officials "scrupulously honor" a suspect's assertion of the right of silence, *Michigan v. Mosley*, 423 *U.S.* 96, 105, 96 *S.Ct.* 321, 327, 46 *L.Ed.*2d 313, 321 (1975), is amply illustrated by the interrogation in this case. Police officers administered *Miranda* warnings to defendant on seven separate occasions between his arrest and his confession. As the majority opinion acknowledges, "[t]here is no evidence of police coercion or misconduct. There were no extended interrogations designed to wear down defendant's will." *Ante* at 418, 581 *A*.2d at 488. It is entirely reasonable to assume that if *Hartley* had been decided before defendant's interrogation, the police officers who had so diligently attempted to comply with the dictates of the *Miranda* rule might well have rewarned defendant after his meeting with his father and prior to resuming interrogation. To invalidate defendant's confession because the police did not observe *Hartley*'s bright-line rule—a rule that did not then exist—is manifestly inappropriate and inconsistent with our retroactivity jurisprudence.

Finally, retroactive application of *Hartley* may very well generate a multitude of post-conviction relief applications from defendants whose confessions were elicited by pre-*Hartley* interrogations. Those confessions may have passed muster under *Michigan v. Mosley, supra,* 423 *U.S.* 96, 96 *S.Ct.* 321, 46 *L.Ed.*2d 313, which required that a suspect's assertion of the right to silence be scrupulously honored, but may not satisfy *Hartley*'s bright-line rule mandating readministration of *Miranda* warnings before resumption of questioning. Thus, it is likely that retroactive application of *Hartley* would adversely affect the administration of justice.

The majority correctly observes that prior decisions of this Court, although not deciding the issue, assumed that *Hartley* applied retroactively, citing *State v. Bey,* 112 *N.J.* 45, 548 *A.*2d 846 (1988) (*Bey I*), and *State v. Bey,* 112 *N.J.* 123, 134–43, 548 *A.*2d 887 (1988) (*Bey II*), *ante* at 424, 581 *A.*2d at 491. In my view, our assumptions in *Bey I* and *Bey II* were unfounded, and should not impel us to decide the issue incorrectly.

The majority compares retroactive application of *Hartley* to the treatment given by the Supreme Court to *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966), observing that "*Miranda* applies to interrogations that took place before that rule was announced if the trial did not commence until after the *Miranda* decision." *Ante* at 422, 581 *A.*2d at 490 (citations omitted). The majority suggests that application of *Hartley* should be no less broad than that of *Miranda,* noting the "obvious similarity" between the "nature and effect" of the two decisions. However, the Supreme Court decision applying *Miranda* to cases tried after the date of decision in that case explicitly *rejected* full retroactive application of the rule:

> In the light of * * * various considerations, we conclude that * * * *Miranda* * * * should not be applied retroactively.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

> \* \* \* Future defendants will benefit fully from our new standards governing in-custody interrogation \* \* \*. Law enforcement officers and trial courts will have fair notice that statements taken in violation of these standards may not be used against an accused. Prospective application only to trials begun after the standards were announced is particularly appropriate here. Authorities attempting to protect the privilege have not been apprised heretofore of the specific safeguards which are now obligatory. Consequently they have adopted devices which, although below the constitutional minimum, were not intentional evasions of the requirements of the privilege. In these circumstances, to upset all of the convictions still pending on direct appeal which were obtained in trials preceding \* \* \* *Miranda* would impose an unjustifiable burden on the administration of justice.
>
> At the same time, we do not find any persuasive reason to extend \* \* \* *Miranda* to cases tried before those decisions were announced, even though the cases may still be on direct appeal. [*Johnson v. New Jersey*, 384 *U.S.* 719, 732–33, 86 *S.Ct.* 1772, 1780–81, 16 *L.Ed.*2d 882, 891–92 (1966).]

Thus, the Court rejected both full retroactivity and retroactive application to cases pending on appeal but tried prior to *Miranda*. The limited form of retroactive application employed by the Court in *Johnson* need not guide our determination of retroactivity under State law.

Relying on the *Nash* factors, this Court has in the past rejected retroactive application of new rules of law that would have invalidated "law enforcement actions undertaken in good-faith reliance upon then long-standing legal authority." *State v. Carpentieri*, 82 *N.J.* 546, 549, 414 *A.*2d 966 (1980); *cf. State v. Lark, supra*, 117 *N.J.* 331, 567 *A.*2d 197 (limiting retroactive application of *State v. Howard, supra*, 110 *N.J.* 113, 539 *A.*2d 1203, to pipeline cases); *State v. Catania*, 85 *N.J.* 418, 446, 427 *A.*2d 537 (1981) (minimization standards adopted by court to be applied only prospectively); *State v. Burstein, supra*, 85 *N.J.* 394, 411, 427 *A.*2d 525 (holding in *State v. Cerbo*, 78 *N.J.* 595, 397 *A.*2d 671 (1979) that delay in presenting wiretap tapes for sealing required suppression absent explanation for delay, would be applied only prospectively); *State v. Carpentieri, supra*, 82 *N.J.* 546, 414 *A.*2d 966 (holding that *Delaware v. Prouse*, 440 *U.S.* 648, 99 *S.Ct.* 1391, 59 *L.Ed.*2d 660 (1979), applies only to random traffic stops occurring after date of decision); *State v. Howery*, 80 *N.J.* 563, 404 *A.*2d 632 (1979)

(holding that *Franks v. Delaware*, 438 *U.S.* 154, 98 *S.Ct.* 2674, 57 *L.Ed.*2d 667 (1978), applies only to search warrants issued after date of decision).

Prospective application of our decision in *Hartley* is fully consistent with these decisions. It avoids the invalidation of confessions admissible in evidence but for the non-observance of *Hartley*'s bright-line rule, which was not only unknown but unanticipated before this Court's decision in *Hartley* was published.

## II.

As I view this record, defendant asserted his right to cut off questioning when he told the police officers that "he would tell [them] about the murder but he first wanted to speak to his father." The resumption of interrogation after defendant spoke to his father, even without fresh *Miranda* warnings, did not constitute a failure by the police to "scrupulously honor" defendant's right to remain silent. In the context of the numerous administrations of *Miranda* warnings over the past several days, the officers could reasonably have assumed that defendant was aware of his right to cut off questioning at any time. The trial court determined that the police officers "fully * * * complied with all of the defendant's constitutional rights," and that defendant knowingly and voluntarily waived his right to remain silent. I would hold that defendant's confession was properly admitted in evidence.

GARIBALDI, J., joins in this opinion.

HANDLER, Justice, concurring and dissenting in part.

In November 1985, the State indicted defendant, Nathan Harvey for capital murder, robbery in the second degree, and burglary in the second degree. Following a jury trial, in October 1986, defendant was convicted on all counts.

The Court now reverses defendant's capital murder conviction and death penalty. I concur in its judgment. I am in accord with the Court's determinations that reversible error occurred in the admission into evidence of defendant's confession and in the failure to provide defendant with a charge that clearly distinguished between intentional murder and murder based only on intent to cause serious bodily injury resulting in death. I write separately to stress what I believe to be additional reasons for the reversals of the conviction and sentence. These relate to the admission and use of expert testimony and of evidence of other crimes. I also reiterate my view that the State's capital murder statute is unconstitutional as enacted, construed and applied, also warranting the reversals in this case. See *State v. DiFrisco*, 118 *N.J.* 253, 284, 571 *A.*2d 914 (1990) (Handler, J., dissenting and concurring).

## I.

The Court recognizes, and the State concedes, that defendant's confession is the most significant evidence of guilt in this case. The Court now rules that the confession was unconstitutionally obtained because the police failed to scrupulously honor his request to remain silent. *Ante* at 420, 581 *A.*2d at 489. I agree with that ruling.

The Court emphasizes that the murder charge in this case clearly failed to comply with the standards of *State v. Gerald*, 113 *N.J.* 40, 69, 549 *A.*2d 792 (1988). I concur in the Court's determination that defendant is entitled to a murder charge that distinguishes intentional murder from serious-bodily-injury murder. *Ante* at 412–414, 581 *A.*2d at 485–486. It is also clear that the failure to give a *Gerald* charge resulted in a determination that cannot be the basis of a capital murder conviction. The jury verdict sheet stated that a finding of intent to cause either death or serious bodily injury resulting in death constituted capital murder. Moreover, as the Court points out, there was adequate evidential support for a *Gerald*

charge. *Ante* at 413–414, 581 *A.*2d at 486; see *State v. Coyle*, 119 *N.J.* 194, 209, 574 *A.*2d 951 (1990). Because the jury was charged on felony-murder, aggravated manslaughter, and manslaughter, there was sufficient evidence to support murder verdicts that were neither knowing nor purposeful. *See State v. Pennington*, 119 *N.J.* 547, 562, 575 *A.*2d 816 (1990).

## II.

The Court recognizes the problematic quality of much of the expert testimony in this case. *Ante* at 425–431, 581 *A.*2d at 492–495. I have the same misgivings as does the Court with respect to much of this evidence. In my view, however, portions of it were unquestionably incompetent and inadmissible, and the resultant prejudice constitutes added grounds for reversal of the conviction.

I concur in the Court's determination that the trial court abused its discretion in admitting the purportedly expert testimony of Dr. Lovejoy. *Ante* at 426–429, 581 *A.*2d at 492–493. Dr. Lovejoy's analysis of the blood-stained pillowcase, and conclusion that a "small man" or an "average-size woman" with a shoe size of 6½ plus or minus one-half size left the print on the pillowcase, were based on an unproven and unreliable methodology. See *State v. Zola*, 112 *N.J.* 384, 447–48, 548 *A.*2d 1022 (1988). Moreover, because this opinion testimony was central identification evidence linking Harvey to the crime, as stressed by the prosecutor in his guilt-phase summation, the error in admitting Dr. Lovejoy's opinion is reversible in my view.

Another serious error involves the expert opinion of Dr. Marvin Shuster. Dr. Shuster performed the autopsy on the victim and testified as a State witness to his opinions and conclusions regarding the cause of death. Defendant claims that the trial court erroneously allowed critical aspects of this opinion testimony which were not based on a reasonable degree of medical certainty or probability. The Court acknowledges

the validity of that standard, noting that "opinions as to possibility are inadmissible," but rules only that it must be satisfied on a retrial. *Ante* at 431, 581 *A.*2d at 495. This opinion testimony was important, the error in its admission serious, and the prejudice caused thereby substantial. I believe it constitutes an independent ground for reversal and the Court, rather than content itself with a precatory admonition, should so state.

On direct examination, Dr. Shuster testified about the length and location of a major head wound. He then indicated the "particular wound ... looked like it was a confluence or at least two." He also stated that "there were pressure marks on the neck" and that "[i]t usually takes quite a number of minutes, probably more in the realm of an hour," to apply that pressure.

That testimony had the potential of being highly significant evidence of the manner in which the killing occurred. Nevertheless, the witness' conclusions were based on no more than "possibilities." He testified as follows:

Q. And [the autopsy report] talks about that six inch opening?

A. That's right.

Q. And it says, does it not, obvious fracturing of the skull is present in the depths of this wound which *may* represent the confluence of several wounds, is that correct?

A. That's correct.

Q. In other words you say that its *possibly* two wounds?

A. Yes.

Q. And it's *possibly not?*

A. That's correct.

Q. This marking on the neck you said *could have been* the result of pressure for approximately an hour, is that correct?

A. That's what I said, yes, sir.

Q. And again this is in the area of *possibility*, is that correct, *it could be possibly less, possibly more?*

A. That's correct, yes.

 \* \* \* \* \* \* \* \*

Q. And you said that it was a blunt object that caused these injuries, is that correct?

A. I said *object or objects.*

Q. You said object or objects?

A. Yes.

Q. Outside the presence of this jury you had voiced an opinion that there was *possibly two objects?*

A. Either two objects or one object with several either sides or characteristics capable of giving different patterns to the injuries, yes.

Q. And this in the range, again, of *possibility?*

A. That's correct.

 \* \* \* \* \* \* \* \*

Q. And the number of blows as you said, *this is the range of possibilities, too, you can't say that definitely or probably that it was fifteen, as far as you know it's possibly fifteen or more?*

A. Fifteen or more, yes.

Critical portions of Dr. Shuster's testimony were not couched in terms of sufficient medical certainty. I believe the failure to explicitly categorize *all* significant portions of Dr. Shuster's testimony in terms of reasonable medical certainty resulted in the disclosure of speculative and inadmissible evidence.

Dr. Shuster's testimony cannot be minimized with respect to its force and influence in this case. His opinions about the number of blows and the type of instrument causing the victim's injuries were crucial to the prosecution's theory that this was not a reflexive or impulsive homicide justifying a manslaughter verdict. The opinion evidence escalated the case into an intentional homicide coupled with a purpose to inflict gratuitous pain and suffering, clearly prejudicing defendant's ability to have a fair determination under *Gerald* as well as to avoid the death penalty under aggravating factor c(4)(c). Yet that opinion evidence was so patently inadequate in terms of the standards that govern medical testimony that its admission must be deemed reversible error.

### III.

The Court finds no major difficulty with respect to a prior conviction admitted for impeachment purposes, nor is particularly troubled by the admission of other-crimes evidence. *Ante* at 431–432, 581 *A.*2d at 495. I believe the conventional standards under which these evidentiary rulings were made are inadequate in the capital-murder context and that, in both

instances, reversible error occurred. See *State v. Long,* 119 *N.J.* 439, 513–18, 575 *A.*2d 435 (1990) (Handler, J., concurring and dissenting).

The Court finds unexceptional the admission of a prior rape conviction to impeach defendant's credibility under *State v. Sands,* 76 *N.J.* 127, 386 *A.*2d 378 (1978). "Given the seriousness of his prior offenses, we see no reason to second-guess the trial court." *Ante* at 432, 581 *A.*2d at 495. It is extraordinary that such evidence could be received in light of other evidence relating to a single pubic hair attributable to a black person found on the victim, which disclosure had the unmistakable potential to inject sexual assault into the case. *Ante* at 429–430, 581 *A.*2d at 493–494.

The Court rules that, "[o]n retrial the prosecution should refrain from referring to the hair as a 'pubic hair.'" *Ibid.* That does not eliminate the grave potential for prejudice inherent in the prior rape conviction, however. Informing the jury that defendant had committed another serious, violent crime in the past has the clear capacity to influence its determination of *substantive* guilt on the capital-murder count. In a capital case, the slight bearing on credibility that such a prior conviction may have can never outweigh such profound prejudice in my estimation. *See State v. Pennington, supra, N.J.* at 561–63, 575 *A.*2d 816 (Handler, J., concurring and dissenting).

The Court recognizes that the other-crimes evidence pertaining to defendant's theft of a hatchet could have a prejudicial impact with respect to the penalty phase of the trial. *Ante* at 432–434, 581 *A.*2d at 495–96. In my view, it is imperative that the potential for prejudice of such evidence in the *penalty*-phase trial be considered by the trial court in determining its admissibility in the *guilt*-phase trial. I stressed in *State v. Long, supra,* that

under *Evidence Rule* 55 and *Evidence Rule* 4, the court must go further and determine the existence of potential prejudice, and weigh the prejudice against the probative worth of the evidence. Because "other-crime evidence has a unique tendency to turn a jury against the defendant," *State v. Stevens,* 115

*N.J.* 289, 302–03 [558 *A.*2d 833] (1989), that weighing process is particularly critical in a capital-murder prosecution. Such proof offered in the guilt phase of a capital-murder trial has an "evidentiary fallout" that can taint not only the jury's determination of guilt but also its determination of life or death. [119 *N.J.* at 515, 575 *A.*2d 439 (Handler, J., concurring and dissenting).]

I repeat:

Those several considerations underscore the need in a capital-murder prosecution to require that any *Evidence Rule* 4 hearing to determine the admissibility of other-crimes evidence—other uncharged crimes, other charged crimes, and other prior convictions—must take into account not only the prejudicial effect on the determination of guilt but also the prejudicial effect on the determination of sentence. *See State v. Pennington, supra,* 119 *N.J.* at 586–87 [575 *A.*2d 816]. The court must, in the guilt-phase of a capital-murder prosecution, I submit, bring into the equation a consideration of the prejudice such evidence can have in terms of arousing, inflaming, or confusing a jury in its critical assessment of aggravating and mitigating factors, and in terms of the capacity of such evidence to mark defendant as an evil, violent and dangerous person. [*Id.* at 516, 575 A.2d 439 (Handler, J., concurring and dissenting).]

Those considerations apply here. As I view the record they justify reversal.

### IV.

I concur and dissent in part from the judgment of the Court.

*Concurring in part, dissenting in part*—Justices HANDLER, O'HERN, GARIBALDI and STEIN—4.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD and POLLOCK—3.