**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3712-14T3

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

NATHANIEL HARVEY,

    Defendant-Respondent.

_____

Argued February 14, 2017 — Decided August 28, 2017

Before Judges Messano, Espinosa and Suter.

On appeal from the Superior Court of New
Jersey, Law Division, Middlesex County,
Indictment No. 85-11-1568.

Nancy A. Hulett, Assistant Prosecutor, argued
the cause for appellant (Andrew C. Carey,
Middlesex County Prosecutor, attorney; Ms.
Hulett, of counsel and on the brief).

Eric V. Kleiner argued the cause for
respondent.

PER CURIAM

    After being twice convicted by a jury and sentenced to death

for the June 1985 murder of Irene Schnaps, defendant Nathaniel

Harvey filed a pro se petition for post-conviction relief (PCR)

alleging the ineffective assistance of counsel (IAC) during the second trial. The matter was transferred to Union County because one of defendant's trial counsel had become a Superior Court judge in Middlesex County. PCR counsel filed various motions seeking additional discovery and forensic testing. The PCR court denied defendant's petition without an evidentiary hearing.

After granting defendant's direct appeal and motion for further forensic testing, the Supreme Court summarily remanded the matter for an evidentiary hearing and ordered the PCR court to "consider the petition . . . anew . . . ."[1] The parties stipulated to the issues to be litigated at the hearing, which included not only defendant's IAC claims, but also that the State failed to provide exculpatory evidence, in violation of Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215, 218 (1963), and newly discovered evidence compelled a new trial.

The hearing took place before Judge Stuart L. Peim, with testimony taken on sixty-two days between April 2011 and February 2014. In a comprehensive, written opinion dated March 11, 2015, Judge Peim granted defendant's petition, staying his order pending

---

[1] The Court originally retained jurisdiction, and entered an additional order further detailing the procedure and scope of the forensic testing. After defendant's death sentence was commuted, the Court ordered that all further appellate proceedings following the evidentiary hearing should be filed in our court.

our decision on the State's motion for leave to appeal, which we later granted.

I.

We provide some necessary context to the specific issues raised in the evidentiary hearing before Judge Peim by relying on the facts as presented in the Court's opinions in defendant's two direct appeals, State v. Harvey, 121 N.J. 407, 411-12 (1990) (Harvey I), cert. denied, 499 U.S. 931, 111 S. Ct. 1336, 113 L. Ed. 2d 268 (1991), and State v. Harvey, 151 N.J. 117, 146 (1997) (Harvey II), cert. denied, 528 U.S. 1085, 120 S. Ct. 811, 145 L. Ed. 2d 683 (2000).

A concerned co-worker found the victim's lifeless body in the apartment where she lived alone in Plainsboro. Harvey II, supra, 151 N.J. at 137-38. There were no signs of forced entry, but the bedroom where the victim was found evidenced a struggle, with bloodstains on the floor, a towel, the mattress and box spring, and a cardboard box protruding from under the bed. Id. at 138. The victim sustained severe wounds to her head and face, and, although her back was covered in blood, there was no blood on the front of her body, suggesting someone had attempted to wipe it clean. Ibid. Police found a bloody sneaker print on a pillowcase, as well as an empty Seiko-LaSalle watch box, empty camera box and

empty jewelry box.  Ibid.  The victim's pocketbook was open and empty in the bathroom.  Ibid.

Contemporaneously with the murder, police in nearby West Windsor had been investigating a string of burglaries and sexual assaults.  Id. at 139.  Defendant fit the physical description of the perpetrator, who usually travelled by foot or on a bike.  Ibid. He was detained, identified by one of the burglary victims, and he confessed to committing several burglaries and a sexual assault. Ibid.  The next day, while performing a consent search of defendant's car, police found a Seiko-LaSalle watch.  Id. at 139-40.

During interrogation following his arraignment, defendant confessed to the murder of Schnaps.  Id. at 140.  On defendant's first appeal, the Court suppressed the confession because of a Miranda[2] violation, but declined to consider defendant's claim that his confession was involuntary.  Harvey I, supra, 121 N.J. at 425. It reversed defendant's conviction on this and other grounds. Harvey II, supra, 151 N.J. at 141-42.

Without defendant's confession available for the second trial, the State relied heavily on DNA and serological evidence.

---

[2] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Id. at 137, 142. Philip Beesley, a forensic scientist employed by the New Jersey State Police, opined that bloodstains on the box spring and cardboard box had genetic markers and enzymes consistent with defendant's blood, not the victim's. Id. at 143. He also stated that the enzyme phenotype found in these bloodstains was found only in African-Americans; defendant is an African-American and the victim was not. Ibid.

Another State Police scientist, Theodore Mozer, testified that a hair recovered from the victim's back did not belong to her and had "Negroid" characteristics consistent with defendant's control hair. Ibid. He also examined sneakers seized when defendant was arrested and from a search of his wife's apartment and stated one sneaker "could" have made the bloody sneaker print left at the scene. Ibid.

Lastly, the State produced two DNA experts from Cellmark Diagnostic Laboratories, Julie Cooper and Dr. Charlotte Word. Ibid. They testified that the blood samples collected from the crime scene were "genetically comparable to defendant's DNA," and "defendant's genotypes for the genetic markers examined were common only to one-in-1,400 African Americans." Id. at 143-44.

Defendant did not testify, but produced two witnesses. Id. at 144. One, from Seiko, said the company produced thousands of watches like the one seized from defendant's car. Ibid.

Defendant's DNA expert, Dr. Robert Shaler, said the Cellmark tests were "scientifically indefensible."  Ibid.  He opined that the genetic makeup of the blood found at the scene was present in "one in fifty to one in 200 African-Americans."  Ibid.

Based on this evidence, the jury convicted defendant, and, following the penalty phase, the judge sentenced defendant to death.  Id. at 144-46.

## II.

Judge Peim heard the testimony of seventeen witnesses, including, among others, the two attorneys who represented defendant at the second prosecution, the assistant prosecutor who tried the first case, and Beesley, Mozer, and Dr. Word.  Defendant produced his own DNA experts, and the State produced additional expert testimony regarding DNA test results conducted after the second trial.

Judge Peim found that senior defense counsel had approximately six years' experience in the Public Defender's Office prior to being assigned defendant's case in 1992.  She had tried two other murder cases, but had never tried a death penalty case or one involving the type of forensic evidence produced at defendant's second trial; she had no training in either death penalty cases or forensics. Junior defense counsel had been assigned to the trial section of the Public Defender's Office

since 1991, approximately three years before the second trial, and, although he was assigned to handle the forensic evidence, he received little or no supervision from co-counsel.

Judge Peim considered defendant's IAC claims as they related to the critical forensic evidence at the second trial, i.e., the serological and DNA evidence, the "Negroid" hair, and the bloody sneaker print. As appropriate, he referenced the relationship between this evidence and Peter Stohwasser, an individual who lived in the same apartment complex as the victim, knew her, and had a history of domestic violence. Stohwasser was the "initial suspect in the case," and the subject of defendant's asserted defense of third-party guilt. Harvey II, supra, 151 N.J. at 203-04.

## A.

Regarding the bloody sneaker print, Judge Peim observed that the State produced a "sneaker expert" at defendant's first trial, Dr. Claude Owen Lovejoy, who completely ruled out two of the three Pony-brand sneakers seized during the investigation and said it was "highly improbable" that the third pair made the print. Dr. Lovejoy also provided expert testimony as to the stature of the person who left the footprint. Harvey I, supra, 121 N.J. at 426. On the first direct appeal, in addressing evidential issues in the event of a retrial, the Court concluded Dr. Lovejoy's "methodology

7

A-3712-14T3

was not of sufficient scientific reliability," with respect to comparing sneaker prints with stature, and he "may not testify as an expert" on retrial. Id. at 429.

However, we agree with Judge Peim that the Court's holding in Harvey I did not foreclose the potential use at the second trial of Dr. Lovejoy's opinion that none of the seized sneakers likely made the footprint. Notably, the Court indicated that expert testimony was not required to compare a shoe print and the shoe alleged to have made that print, nor was it required to establish the proposition that shorter people tend to have smaller feet. Id. at 427. Also, Mozer's expert testimony at the second trial was certainly "inconsistent" with the State's evidence at the first trial. Judge Peim found defense counsel should have either moved Dr. Lovejoy's testimony into evidence, called him as a defense witness, or hired their own expert, but they did none of these things. Instead, the cross-examination of Mozer regarding the bloody footprint was very brief.

Judge Peim then considered the effect of this failure in the context of defendant's third-party guilt claim. He noted defense counsel were provided with the sworn testimony of a police detective in support of a search warrant for Stohwasser's apartment. The judge noted it was unclear from the testimony at the PCR hearing whether trial counsel had read this discovery,

8

but, "[b]ased on the fact that useful information [in the discovery] was not used by defense counsel, one must conclude it was not read, or read and forgotten."

In the sworn testimony to obtain the search warrant, the detective claimed the bloody footprint was made by a Nike sneaker, the type worn by Stohwasser, not defendant. The detective also characterized Stohwasser as "deceptive" when questioned about the victim's death. Moreover, Judge Peim observed that Mozer identified the bloody print as being made by a Pony sneaker only after defendant was arrested, although an investigator identified a Pony logo on the print before defendant's arrest.

In fact, Mozer's handwritten notes predating defendant's arrest indicated the footprint was "incomplete — no further information could be developed." Judge Peim found that defense counsel never asked for "all documents which relate[d] in any way to the analysis of the bloody footprint." Regardless, the judge found these notes should have been turned over by the State under Brady. Judge Peim also found Mozer could have been effectively cross-examined with his own notes, and, further, that defense counsel never questioned Mozer about the fact that no blood was found on any of the seized sneakers, even though "[t]he crime scene was covered in blood, [and] the killer left a bloody footprint."

Regarding the "Negroid hair" recovered from the victim's back, the Court rejected defendant's argument raised on the first appeal that Mozer was unqualified and unfamiliar with accepted standards for comparison. Harvey I, supra, 121 N.J. at 429-30. Mozer testified at the first trial that "the hair had come either from defendant or from '[a]nother individual who had [the] same microscopic characteristics.'" Id. at 429. On defendant's second appeal, the Court was unpersuaded that the prosecutor's examination of Mozer was improper. Harvey II, supra, 151 N.J. at 217-18.

Judge Peim considered Mozer's testimony at the PCR hearing, in which the expert acknowledged that his analysis of the two hairs was highly subjective.

> Q. [By judge]:  I'll know it when I see it,
> that's the analysis.
>
> A. [Mozer]:  I'm afraid so, Judge.

The hair itself was never produced at either trial, and Judge Peim found that "[w]hen the hair became missing and under what circumstances [was] not clear." Trial counsel in the second trial never asked to see the hair or other evidence of Mozer's analysis, such as microscopic slides, photographs, or notes. At the PCR

hearing, both defense counsel testified they did not know the hair was missing.[3]

Judge Peim concluded trial counsel should have demanded the hair and all discovery relating to the hair, or, alternatively, they should have retained an expert to challenge the reliability of Mozer's analysis. The judge also found that the State "should have specifically disclosed that the hair was missing." He reasoned that if, as the State alleged, trial counsel knew the hair was missing, counsel "were ineffective in how they handled the hair situation." The judge concluded defense counsel should have sought to have any testimony about the hair excluded, or, failing that, cross-examined Mozer about the missing hair, lack of notes or photographs, and sought an adverse inference charge. Yet, they "did not pursue any of these avenues."

C.

Judge Peim carefully considered trial counsel's handling of the DNA evidence at the second trial. He recognized that Cellmark's DNA analysis of the bloodstained box spring was the "smoking gun," because it concluded the stain's genetic markers were a combination of the victim's and defendant's blood. At the same time, he referred to a letter from Dr. Shaler to defense

---

[3] In a post-trial certification, however, senior trial counsel said she recalled the hair itself was lost prior to the retrial.

counsel sent in 1994, which definitively stated that based upon serological (blood-type (A/B/O) testing), the bloodstain on a cardboard box found under the bed and immediately below the stained box spring could not have come from either defendant or the victim.

Critically, at the second trial, Beesley testified that the blood from the box spring had dripped onto the cardboard box. However, in very limited cross-examination, he was never questioned about A/B/O testing and any inconsistency between the two stains. As Judge Peim recognized, if Beesley acknowledged that based upon the A/B/O testing the stain on the cardboard came from neither defendant nor the victim, "[t]his would have established that there had to be a third bleeder at the scene."

More importantly, with respect to the theory of a third bleeder, the judge cited Cellmark's acknowledgment that it was generally impossible to determine DNA types of individual donors when three or more donors were present by using the specific analyses it employed. Yet, Judge Peim found trial counsel failed to challenge Cellmark's assumption that there were only two donors to the bloodstain on the box spring. Judge Peim specifically addressed this in the context of the opinion in Harvey II, in which, based on the record then before it, the Court rejected defendant's "third-person" argument as "more theoretical than real." 151 N.J. at 184.

Judge Peim also considered a second assumption made by Cellmark, i.e., there were equal amounts of the victim's blood and defendant's blood in the stain. He noted Beesley's own report indicated most of the blood found at the scene was "genetically compatible" with the victim. He also noted serious questions regarding the scientific reliability of Cellmark's conclusions in light of the testimony of defendant's DNA experts at the PCR hearing.

Judge Peim acknowledged that some of Dr. Shaler's testimony at the second trial rebutted the conclusions reached by Cellmark, and that despite very short cross-examination, trial counsel elicited an admission from Dr. Word that it could not be conclusively determined whether the stain on the box spring came from more than two people. Ultimately, however, the judge determined "[t]here were avenue[s] to attack the DNA and serology analysis that were not used . . . and should have been[,]" as they were disclosed directly in correspondence from Dr. Shaler to defense counsel.

D.

Lastly, Judge Peim considered trial counsels' performance regarding the assertion of third-party guilt. He noted that senior counsel's opening statement claimed the State's investigation stopped short of proving that defendant, "to the exclusion of

13

anyone else," killed the victim. One of the lead investigators in the case, James O'Brien, testified that law enforcement eliminated Stohwasser as a suspect after items seized from his apartment tested negatively for the presence of blood, Stohwasser had no footwear that matched the bloody foot print on the pillowcase, a Negroid hair was discovered at the scene, and Stohwasser passed a polygraph. Harvey II, supra, 151 N.J. at 203-206. Trial counsel asked for a mistrial based upon this reference to a polygraph, but the judge gave a curative instruction instead. The Court concluded any prejudice was "minimal." Id. at 206.

However, the PCR proceedings revealed that Stohwasser had not passed the polygraph. In fact, the sworn testimony supporting the search warrant of Stohwasser's home indicated the opposite. Defense counsel had this information in the discovery provided by the State.

At the PCR hearing, O'Brien testified the prosecutor told him in advance that he was going to ask about the polygraph, and he claimed he testified truthfully, i.e., he believed, based on conversations with other investigators, that Stohwasser actually did pass the test.[4] Senior defense counsel testified at the PCR hearing that she essentially abandoned the third-party guilt claim

---

[4] O'Brien was not the investigator whose testimony secured the search warrant.

once the jury heard Stohwasser had passed a polygraph. Her decision was further influenced by the prosecutor's warning that if she explored the third-party guilt claim, he would seek to have defendant's confession admitted, since in Harvey I the Court never addressed the voluntariness issue.

More importantly, defense counsel never asked for the polygraph file in discovery. It revealed that the polygraphist concluded Stohwasser was deceptive as "to all questions asked including when he denied being involved in [the] murder."

Judge Peim listed six other statements in the testimony supporting the search warrant, in addition to the "Nike" sneaker statement, which supported the State's proofs that probable cause existed to believe Stohwasser murdered the victim. These included Stohwasser's desire to have a romantic relationship with the victim, even though she was not interested, prior incidents of domestic violence and damage to property, and that Stohwasser lived in the same apartment complex.

Judge Peim acknowledged it was unlikely the results of the polygraph test would have been admitted at the second trial, but defendant could have impeached O'Brien's credibility by using the prior sworn testimony. He also noted O'Brien's testimony at trial, that police found no items containing blood in Stohwasser's home, was false, since police actually seized a quilt that tested

positively for human blood.  Additional analysis could not develop further identification of the blood, and authorities returned the quilt to Stohwasser before the first trial.

E.

Judge Peim concluded defendant had not received "adequate assistance of counsel as guaranteed by the Sixth Amendment." Noting again the State's reliance on serological and DNA evidence, the judge concluded trial counsel had "strong and more viable" means to "rebut and attack this evidence which were not utilized . . . ."  He determined these "approaches would have been obvious from a careful review" of discovery and the record from the first trial, including Dr. Lovejoy's testimony about the sneaker print, the investigator's testimony in support of the Stohwasser search warrant, lab tests done on the quilt seized from Stohwasser's home, Beesley's blood-type analysis of the bloodstains at the crime scene, and correspondence from defense DNA experts at trial.

Judge Peim also concluded that trial counsel failed to "request items from the State which any experienced criminal lawyer would have asked for," including the polygraph file, and all documents regarding the bloody footprint and the "Negroid hair." He found that "there is a reasonable probability that but for these deficiencies . . . the result of the trial would have been different."  He granted defendant's petition.

16

III.

Before us, the State argues in a single point:

POINT I

THE COURT BELOW IMPROPERLY USED HINDSIGHT TO RULE THAT TRIAL COUNSEL WAS INEFFECTIVE IN THE 1994 RETRIAL.

We have considered the State's contention, in light of the considerable record from the evidentiary hearing and applicable legal standards. We affirm substantially for the reasons expressed by Judge Peim. We add only the following.

To establish an IAC claim, a defendant must satisfy the two-prong test formulated in Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674, 693 (1984), and adopted by our Supreme Court in State v. Fritz, 105 N.J. 42, 58 (1987). First, he must demonstrate "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Id. at 52 (quoting Strickland, supra, 466 U.S. at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693).

> To satisfy prong one, [a defendant] ha[s] to "overcome a 'strong presumption' that counsel exercised 'reasonable professional judgment' and 'sound trial strategy' in fulfilling his responsibilities." "[I]f counsel makes a thorough investigation of the law and facts and considers all likely options, counsel's trial strategy is 'virtually unchallengeable.'" Mere dissatisfaction with "'a counsel's exercise of judgment'" is

> insufficient to warrant overturning a conviction.
>
> [State v. Nash, 212 N.J. 518, 542 (2013) (third alteration in original) (citations omitted).]

Second, a defendant must prove that he suffered prejudice due to counsel's deficient performance. Strickland, supra, 466 U.S. at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693. A defendant must show by a "reasonable probability" that the deficient performance affected the outcome. Fritz, supra, 105 N.J. at 58. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" State v. Pierre, 223 N.J. 560, 583 (2015) (quoting Strickland, supra, 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698). "If [a] defendant establishes one prong of the Strickland-Fritz standard, but not the other, his claim will be unsuccessful." State v. Parker, 212 N.J. 269, 280 (2012).

"Our standard of review is necessarily deferential to a PCR court's factual findings based on its review of live witness testimony. In such circumstances we will uphold the PCR court's findings that are supported by sufficient credible evidence in the record." Nash, supra, 212 N.J. at 540 (citing State v. Harris, 181 N.J. 391, 415 (2004), cert. denied, 545 U.S. 1145, 125 S. Ct.

2973, 162 L. Ed. 2d 898 (2005)). However, we review the PCR court's legal conclusions de novo. Id. at 540-41.

The State does not contend, nor could it, that Judge Peim's factual findings were not supported by substantial credible evidence in the record. Instead, it argues first that the judge "essentially ruled that [defense counsel] could have been better." We disagree.

Judge Peim cited specific shortcomings that demonstrated counsels' performance was deficient. This included the failure to seek discovery on critical issues in the case, as well as the inability to consider the significant implication of what was actually contained in some of the discovery defendant did receive. We agree with the judge's legal conclusion that counsels' performance was deficient.

The State next argues that Judge Peim's "analysis [was] barren of any meaningful discussion of prejudice within the meaning of Strickland and Fritz." We again disagree.

"Important to the prejudice analysis is the strength of the evidence that was before the fact-finder at trial." Pierre, supra, 223 N.J. at 583. As noted, the State's case at defendant's second trial was wholly tethered to the Negroid hair and the bloody sneaker print, for which the only significant witness was Mozer, and the serologic and DNA evidence. The only other important

19

evidence was the empty watch box found at the scene and the watch found in defendant's vehicle, which circumstantially tied defendant to the victim.

Mozer's opinions were both somewhat equivocal and certainly subject to effective attack, through the use of documentary evidence which, in some instances, was available to defense counsel, and in other instances, should have been produced by the State but was not, or should have been requested in discovery.

Judge Peim notably did not conclude that defense counsel's performance regarding the DNA evidence was in and of itself deficient. As evidence adduced at the PCR hearing demonstrated, there were significant advances in DNA technology in the intervening years between defendant's second trial and the PCR hearing. Defense counsel could not be deficient in failing to raise arguments based upon the more specific science that was not yet available. Additionally, at the PCR hearing the State produced the results of new DNA testing performed in 2008 that substantiated the critical conclusion that the stain on the box spring was the combined DNA of two people, and the probability of defendant's inclusion was even greater than testified to at trial.

However, the judge did not conclude that defendant's new DNA testing supported a claim of actual innocence, or was newly discovered evidence that warranted a new trial. See, e.g., Nash,

supra, 212 N.J. at 549-50 (discussing PCR based upon newly discovered evidence). Rather, Judge Peim concluded defense counsel failed to appreciate the significance of other serological evidence and the impact of that evidence upon Cellmark's conclusions as testified to at the time of the second trial. In short, we agree with Judge Peim. "Defendant's counsel's errors were sufficiently serious so as to undermine confidence that defendant's trial was fair, and that the jury properly convicted him." Pierre, supra, 223 N.J. at 588.

Affirmed. We remand the matter to the Law Division for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3712-14T3