174 N.J. Super. 426 (1980)
416 A.2d 956
EVERETT G. JOHNESEE AND MARY J. JOHNESEE, PLAINTIFFS-RESPONDENTS,
v.
THE STOP & SHOP COMPANIES, INC., A CORPORATION OF THE STATE OF MASSACHUSETTS AUTHORIZED TO DO BUSINESS IN THE STATE OF NEW JERSEY, AND H.J. HEINZ COMPANY, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued February 5, 1980.
Decided June 5, 1980.
*428 Frank P. Addas argued the cause for appellants (James & Addas, attorneys).
William O. Barnes, Jr., argued the cause for respondents.
Before Judges MATTHEWS, ARD and POLOW.
*429 PER CURIAM.
Plaintiffs instituted this action against their local supermarket, Stop & Shop, and against the H.J. Heinz Company, alleging that plaintiff Everett was poisoned by a can of mushroom soup sold by Stop & Shop and manufactured by Heinz. Plaintiffs asserted claims of negligence, breach of warranty and strict liability against both defendants. Plaintiff Mary sued for loss of consortium. A jury returned a verdict against both defendants of $25,000 as to Everett and $5,000 as to Mary.
Defendants challenge several evidential rulings by the trial judge. They first question his exclusion of the testimony of their only medical expert, Dr. Lewis. The controversy arose because of the lack of certainty expressed by Dr. Lewis in his three reports provided to plaintiffs during discovery. The first report, dated June 28, 1976 and summarizing the physical examination, reached no final conclusion because Dr. Lewis wanted to examine the hospital record. He offered the following, however: "Pending that information [the hospital record], it appears to be medically improbable that the patient's hepatitis resulted from the meal in question." No basis for that hypothesis appears in the report.
A second report, also dated June 28, 1976, discussed the possible causes of Everett's hepatitis. Dr. Lewis listed the three usual causes: exposure to another person so inflicted (infectious hepatitis); internal contact with contaminated blood (serum hepatitis), a common source for those who use syringes, as do morticians (Everett was a mortician), and ingestion of contaminated food (infectious hepatitis). Of the three, he termed the last the "least likely possibility," because (1) plaintiff ate the soup on September 22 and collapsed on September 28, a period too short for the expected two-week incubation period, and (2) plaintiff's wife did not contract hepatitis despite having eaten the same soup.[*]
*430 Dr. Lewis issued his final report on August 5, 1976 after having reviewed the hospital record. In pertinent part he reasoned:
The doctors make a diagnosis of "infectious hepatitis" but there is no way in which the nature of that infection was established. Nothing was done which would help differentiate ordinary infectious hepatitis, from the usual unknown sources (another person carrying the virus) from food contamination source. We do know now, however, that he was Australian antigen positive. The odds now begin to shift in the direction of contamination of his blood, possibly as a result of his professional work as I previously explained. In ordinary infectious hepatitis only 20% of patients become Australian antigen positive. Serium [sic] hepatitis contracted from contaminated blood, some 80% become positive. The odds, obviously shift, in the direction of so-called serium [sic] hepatitis (now known as hepatitis-B).
He concluded by ranking the causes by possibility:
In essence, then, I would now place the possibilities, in terms of etiology, in the following order of likelihood:
1. Serium [sic] (hepatitis-B) caused by contaminated blood at work.
2. Ordinary infectious hepatitis (hepatitis-A) from an unknown source in the general population.
3. Hepatitis as a result of the contaminated food which did not produce hepatitis in the wife.
At trial Dr. Lewis testified that "serum hepatitis is not a serious consideration here ... The most likely source is the decision [sic] he caught it from someone else in the general community." At that point plaintiffs' counsel objected because the doctor had failed to cast his opinion in terms of reasonable medical probability. He further complained that Dr. Lewis addressed only possibilities in the reports provided in discovery; he claimed surprise if the doctor were permitted to now change his opinion to reflect probabilities. Defense counsel countered that the reports indeed did reflect probabilities, although perhaps not worded precisely enough, and he requested the chance to ask the doctor what he had meant.
The trial judge sustained plaintiffs' objection, ruling that Dr. Lewis's opinion was inadmissible because his reports did not mention "medical probability," and that to permit him to explain his opinion would result in unfair surprise.
*431 It is true that medical-opinion testimony must be couched in terms of reasonable medical certainty or probability; opinions as to possibility are inadmissible. Gribbin v. Fox, 130 N.J.L. 357, 359 (Sup.Ct. 1943), aff'd 131 N.J.L. 187 (E. & A. 1944); In re Quackenbush, 156 N.J. Super. 282, 287 (Cty.Ct. 1978). See Annotation, "Admissibility of opinion evidence as to cause of death, disease, or injury," 66 A.L.R.2d 1082, 1118-1126 (1959). But we do not think Dr. Lewis's testimony lacked the requisite certainty. The doctor's first two reports, however suspect they might have been from an evidential weight standpoint, clearly expressed the opinion that it was not reasonably probable that the soup caused the hepatitis. Dr. Lewis felt that other causes were more probable, although he could not say which. It is not a defendant's burden to prove by a reasonable medical probability what caused the claimed injury. That is plaintiff's burden, and a defendant should be able to rebut any such proof by medical evidence negating the claimed cause. The point is that plaintiff's counsel knew or should have known that at trial Dr. Lewis would challenge the alleged cause. Indeed, plaintiff presented Dr. Martinez, who testified that the soup was the probable source. Any additional witnesses would have been cumulative.
Furthermore, Dr. Lewis should have been permitted to explain whether his ordering of possibilities in his final report could be interpreted in terms of medical probabilities. Regardless of the terminology he used, his listing at least should have informed plaintiff that number three (the soup source) was deemed by him not to be the probable cause. If at trial the doctor was unwilling to assess reasonable medical probabilities, then the judge would have been warranted in excluding his testimony. But if Dr. Lewis were able to so testify, the jury was entitled to consider that evidence as a counterweight to Dr. Martinez and to resolve the conflict in its role as the factfinder.
Next defendants argue that the trial court erroneously excluded the testimony of John Dryer, the quality-assurance manager for Heinz.
*432 After defendants made an offer of proof concerning Dryer's proposed testimony, plaintiffs' counsel objected that nothing provided in discovery disclosed the intended testimony, and that in any case, it would be irrelevant to the issues of breach of warranty and strict liability. (Defendants conceded that the testimony was not offered to rebut negligence.) A voir dire was conducted, during which Dryer testified on three subjects: (1) the sterilization and inspection process used on the batch from which the soup in question came; (2) the effect of the sterilization on any existing viruses, and (3) the results of a test made after the incident on a can from the same batch. The thrust of Dryer's account was that careful measures were taken to avoid contamination, which measures were successful in the sample tested.
The trial judge excluded all of the proffered testimony because plaintiffs' theory of recovery was implied warranty or strict liability, as opposed to negligence, and thus Heinz's exercise of due care was irrelevant. While such testimony is normally pertinent to establish whether the defect existed when it left the manufacturer (a necessary element of a warranty or strict liability action), the trial judge reasoned, it was not admissible when the product is sold in a sealed container and the harm is caused by a virus rather than a foreign substance.
As they did below, defendants rely exclusively upon Simon v. Graham Bakery, 17 N.J. 525 (1955). There plaintiff sued a bakery for injuries sustained from a piece of glass embedded in a loaf of bread. Since plaintiff proceeded solely on a breach of warranty claim, the trial judge barred defendant's proposed evidence of the procedure used in baking the bread. 17 N.J. at 526. The Supreme Court reversed. While the court agreed that the testimony was inadmissible if offered to prove the exercise of due care, it "was admissible for another purpose, i.e., to refute the inference that the jury might otherwise draw that the piece of glass was in the bread when it was purchased." 17 N.J. at 529. Since plaintiff was obliged to prove that the defect was present when the bread left defendant's hands, defendant was entitled to rebut that proof. 17 N.J. at 531. Given the *433 four-day interval between purchase and injury, there arose a jury question as to when the glass appeared.
The trial judge here distinguished Simon on the ground that a "foreign substance" was involved there, as opposed to a virus in a sealed container. Although he did not amplify this distinction, he apparently meant that there was no suggestion in the proofs that the virus entered the soup after it left Heinz. It was in a sealed can, and Mrs. Johnesee brought it to a full boil within minutes after opening the can. Thus there was no jury question as to when the virus was born, and Dryer's description of the safeguards had no relevance. For the same reason the trial judge barred Dryer's other two proposed items of testimony: that the process would kill all viruses, and the post-incident test revealed no contamination of a sample can. Each would be relevant to prove lack of negligence, not to defeat implied warranty or strict liability.
We disagree with the trial judge's reasoning for excluding the proffered testimony. In a foreign substance case, where it is possible for the substance to enter the food after leaving the manufacturer's hands, evidence that the substance was not present when the food was under defendant's control would be relevant to disprove that necessary element of a products liability claim. However, proof that the soup was made under the most hygenic conditions does not tend to exculpate the maker, since a single can might become contaminated in spite of all reasonable precautions.
Nevertheless, a certain improbability as to the truth of plaintiffs' version exists which defendants should not be foreclosed from establishing. The issue is one of credibility. A manufacturer rarely has available anything more than circumstantial evidence to disprove a plaintiff's claim relating to the discovery and existence of an alleged defect in a product. Evidence such as that proffered here should be admissible, not to show lack of fault or the presence of due care on the manufacturer's part, but rather as relevant evidence tending to show the improbability of the defect as claimed by plaintiffs. *434 While there may be fact situations in which, by reason of the intrinsic nature of the defect and the impossibility of its occurrence other than in the manufacturing process, barring evidence of quality control procedures in manufacture, we do not regard the situation presented here as such. In short, the proffered evidence goes directly toward refuting the credibility of plaintiffs' testimony. We regard the trial judge's exclusion of the offered testimony erroneous for this narrow reason. Of course, the jury should be instructed as to the use of such evidence.
We agree with defendants' argument that the trial judge permitted plaintiffs, as individuals, to recover an item of damage properly recoverable only by plaintiffs' corporation, which was not a party to this action. Plaintiffs testified that they were the sole stockholders of a funeral home, which was also plaintiff Everett's principal place of employment. Due to Everett's extended illness from the food poisoning, the corporation paid out $4,800 to a Mr. Link in return for Link's performance of duties normally performed by plaintiff. In addition, plaintiffs requested, and the trial judge instructed the jury accordingly, that damages could be awarded in the amount of Everett's expected salary during his one-year inactivity  $6,500. The jury's total award was not allocated among the various claimed expenses.
By permitting the jury to consider both Everett's lost salary and the amount paid to Link, the trial judge allowed a double recovery for the same loss. If Everett had been able to work, the corporation would not have had to expend $4,800 to pay Link, since Link did only what Everett could not do. Everett would be made whole, therefore, by the recovery of his normal salary, $6,500. To award damages for both forms of compensation would unjustly enrich plaintiffs.
It is impossible to determine how much of the award, if any, was attributable to the payment to Link. But it is possible that it reflected an amount in excess of the actual loss to plaintiffs. Accordingly, at the retrial the jury should be instructed that it can consider only the amount of Everett's lost *435 salary. The claim for the amount paid to Link, if recoverable at all, could be claimed only by an action on behalf of the corporation. See Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727, 732 (3 Cir.1970), cert. den. 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971); Schaffer v. Universal Rundle Corp., 397 F.2d 893, 896 (5 Cir.1968).
Reversed and remanded for a new trial.
NOTES
[*] The first ground was factually unsupported: plaintiff ate the soup on September 11, not on September 22. Hence the incubation period was approximately that expected by Dr. Lewis. The second ground may also be questioned in that Mrs. Johnesee ate much less than plaintiff did, a fact not mentioned by Dr. Lewis, and which might explain her quicker recovery.