**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3580-16T2

LUZI BARTSCH,

    Plaintiff-Appellant,

v.

IRMA LAGE,

    Defendant,

and

GEICO INSURANCE COMPANY,

    Defendant-Respondent.

_____

Argued July 17, 2018 – Decided January 10, 2019

Before Judges Ostrer and Vernoia.

On appeal from Superior Court of New Jersey, Law Division, Essex County, Docket No. L-5583-14.

Lazaro Berenguer argued the cause for appellant (Clark Law Firm, PC, attorneys; Lazaro Berenguer, on the briefs).

Bryan T. Kurtzberg argued the cause for respondent (Law Offices of Cindy L. Thompson, attorneys; Bryan T. Kurtzberg, on the brief).

The opinion of the court was delivered by

OSTRER, J.A.D.

Plaintiff Luzi Bartsch appeals from the dismissal of her auto negligence lawsuit seeking underinsured motorist benefits from her auto insurer, defendant Geico Insurance Company, for injuries she suffered in a collision caused by defendant Irma Lage. Two experts testified that Bartsch's injuries were permanent. However, the trial court granted Geico's motion for involuntary dismissal because neither stated that his opinion was within a reasonable degree of probability. Bartsch appeals from this and several evidentiary rulings. We affirm some of the evidentiary rulings, reverse others, and reverse the involuntary dismissal and remand for a new trial.

## I.

On January 25, 2013, Lage ran a stop sign and collided with Bartsch's car. Bartsch claimed her neck and back were injured. After settling with Lage, Bartsch sought underinsured motorist benefits from Geico, which disclaimed liability because she had not satisfied the "limitation on lawsuit" coverage option she selected. In particular, Geico maintained she had not suffered "a permanent

injury within a reasonable degree of medical probability." N.J.S.A. 39:6A-8(a). The matter was tried before a jury solely on the issue of damages, specifically whether the accident caused Bartsch's injuries, and whether they were permanent.

Several of the trial court's rulings are at issue. First, the trial judge excluded Bartsch's husband from testifying about the effect of the accident on her daily living. In its interrogatories, Geico requested that Bartsch provide the names of individuals with knowledge of any of the relevant facts. In response, Bartsch generally identified "all persons named in answers to interrogatories and depositions," and her "family members," but did not expressly identify her husband. During her deposition, however, she referred to her husband and explained the injuries from the accident affected her relationship with him. When Bartsch later named her husband as a fact witness at trial, Geico claimed undue surprise and sought to bar him from testifying because Bartsch had not specifically named him in her interrogatory answer. The trial court agreed.

The next evidentiary ruling occurred at trial. Geico called only one expert, Dr. Edward Decter, an orthopedic surgeon who examined Bartsch in March 2015. Before examining Bartsch, Dr. Decter reviewed her post-accident medical records, including those of a spinal surgeon, Dr. Kopacz, who examined Bartsch

soon after the accident. Relying in part on Dr. Kopacz's records, Dr. Decter testified that Bartsch's alleged pain was not consistent with the area of her neck she said was injured in the accident. He opined that the pain arose from the gradual degeneration of her spine and loss of water content. He also disputed that she sustained any permanent injury.

In response to Geico's questioning, Dr. Decter relayed objective findings that Dr. Kopacz reported upon physical examination. Dr. Kopacz noted Bartsch had a normal gait, sensation to light and pin-prick touching, reflexes, and strength in her extremities. Dr. Kopacz also reported no finding of "any patchy deprivation of sensation," contrary to what Bartsch self-reported to Dr. Decter. Notably, Geico's counsel stopped Dr. Decter when he appeared ready to disclose Dr. Kopacz's opinion regarding Bartsch's MRI results.

Bartsch's counsel objected on the ground that Dr. Kopacz was not a witness and could not be cross-examined; allowing Dr. Decter to repeat Dr. Kopacz's findings would, therefore, allow Dr. Kopacz's statement "through the back door." The trial judge overruled the objection and held Dr. Decter could relay Dr. Kopacz's report as the basis for his opinion. Shortly thereafter, Bartsch's counsel objected again, arguing that Geico wanted the jury to consider

4

Dr. Kopacz's report for its truth, and it constituted "complex and disputed matters." The trial judge overruled the objection again.

The trial judge also denied Bartsch's request to question Dr. Decter about a censure he received from the Board of Directors of the American Association of Orthopaedic Surgeons. The censure related to one of his written expert reports, which the organization found was not given "in a fair and impartial manner," in violation of its Standards of Professionalism for Orthopaedic Expert Witness Testimony. The trial judge barred evidence of the censure because Bartsch could provide no information about the organization's procedures and whether they complied with Dr. Decter's due process rights.[1]

The trial court's final, and most crucial, ruling was to dismiss the suit after Bartsch rested, because her experts had not specifically stated they were testifying to a reasonable degree of medical probability. The two expert witnesses were a chiropractor and a pain management physician. Each examined or treated her after the accident.

---

[1] We note that the trial court nonetheless permitted Geico to question Bartsch's expert, Dr. Burt, on a reprimand he received from the New Jersey State Board of Medical Examiners, based on the findings of its Virginia counterpart, for violating a Virginia law against deceptive or fraudulent activity. However, Geico's counsel ultimately chose not to reference the reprimand, apparently for tactical reasons. Therefore, we need not pass on the propriety of its admission.

Bartsch had previously visited the chiropractor, Dr. Mark Rodrigues, for neck and back pain several times, but had stopped the visits a few months before the accident. She returned after the accident with renewed pain, and saw him forty-eight more times. He diagnosed Bartsch with cervicalgia and lumbalgia and opined that the pain she suffered after the accident was unrelated to her pre-accident pain. Dr. Rodrigues also opined that her injury was permanent, given that she was still in pain well after the accident. When asked if he was certain in his assessments, Dr. Rodrigues said, "without a doubt."

The pain management specialist, Dr. Clifton Burt, who first saw Bartsch after the accident, relied on an electromyographic test (EMG) in diagnosing cervical and lumbar radiculopathy, which he testified were a result of the car accident. When asked if the injuries were permanent, he said, "[I]t's very possible that any movement with the disc bulge still sitting there can re-irritate a nerve root again." He repeated, "[Y]es, it's a good possibility that the original cause and the original disc bulges can lead to permanent symptoms." While both Dr. Rodrigues and Dr. Burt had submitted written certifications before trial stating they held their opinions "to a reasonable degree of medical certainty," neither used that phrase while on the stand.

A-3580-16T2

At the close of Bartsch's case, Geico moved for a directed verdict on the ground that the two experts had not testified to a "reasonable degree of medical probability," and had testified only that Bartsch "had bulges." The trial judge granted the motion and entered an involuntary dismissal under Rule 4:37-2(b), explaining:

> [T]he issue of expert testifying with a reasonable degree of medical probability is one of the things I look for. . . . [I]n this particular case when the plaintiff had his doctors testify for whatever reason he did not have them testify to that standard and though counsel for the defense did it with Doctor Decter I was waiting for it from the plaintiff and it didn't occur. . . . The issue here is whether together with the legitimate inferences therefrom plaintiff has made out a case in the verbal threshold . . . . [T]o establish permanency you have to have an expert who['s] testifying within a reasonable degree of medical probability. And as I said there is no establishment by the plaintiff of reasonable medical probability based upon the testimony of the physicians . . . .

On appeal, Bartsch contends the trial court erred in: granting the directed verdict; "disregard[ing] James v. Ruiz"[2] by allowing Dr. Decker to "back door" Dr. Kopacz's opinion; barring her husband from testifying; and barring her counsel from cross-examining Dr. Decker about his prior sanction. Bartsch also seeks the costs of appeal pursuant to Rule 2:11-5.

---

[2] 440 N.J. Super. 45 (App. Div. 2015).

A-3580-16T2

II.

A.

We first address the trial court's dismissal of Bartsch's case based on its finding that she failed to present expert testimony within a reasonable degree of medical probability that her injuries were caused by the accident and permanent in nature.

In reviewing an involuntary dismissal motion, we apply the same standard the trial court does. Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016). After a plaintiff has rested, a defendant may move to dismiss if "upon the facts and upon the law the plaintiff has shown no right to relief." R. 4:37-2(b). The motion shall be denied "if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor." Ibid. Involuntary dismissal should be granted only if "no rational juror could conclude that the plaintiff marshaled sufficient evidence to satisfy each prima facie element of a cause of action." Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 197 (2008).

As Bartsch's injury did not result in "death; dismemberment; significant disfigurement or significant scarring; displaced fractures; [or] loss of a fetus," she was barred from recovering damages for "non-economic loss" unless she

could prove she suffered a "permanent injury within a reasonable degree of medical probability, other than scarring or disfigurement." N.J.S.A. 39:6A-8(a); see also DiProspero v. Penn, 183 N.J. 477, 488 (2005). An injury is "permanent" "when the body part or organ, or both, has not healed to function normally and will not heal to function normally with further medical treatment." N.J.S.A. 39:6A-8(a). A plaintiff must serve on the defendant a certification from a board-certified licensed physician, or licensed treating physician, stating that the plaintiff has suffered a qualifying injury "based on . . . objective clinical evidence." Ibid. The trial court may properly dismiss a suit that lacks the requisite expert medical testimony based on objective clinical evidence. Agha v. Feiner, 198 N.J. 50, 61 (2009). In addition to proving a permanent injury, a plaintiff must adduce expert testimony, within a reasonable degree of medical probability, that the accident caused the injury. Johnesee v. Stop & Shop Cos., 174 N.J. Super. 426, 431 (App. Div. 1980).

"[M]edical-opinion testimony must be couched in terms of reasonable medical certainty or probability; opinions as to possibility are inadmissible." Ibid. However, the certainty requirement does not oblige experts to use "'talismanic' or 'magical words,'" so long as the court is "persuaded that 'the doctor was reasonably confident of'" the opinion. Eckert v. Rumsey Park

Assocs., 294 N.J. Super. 46, 51 (App. Div. 1996) (quoting Azpiazu v. Orgera, 535 A.2d 338, 342 (Conn. 1987)); see also id. at 52 (stating that opinion as to causation will not "be satisfied by a single verbal straitjacket alone, but, rather, by any formulation from which it could be said that the witness' whole opinion reflects an acceptable level of certainty") (quoting Matott v. Ward, 399 N.E.2d 532 (N.Y. 1979)).

Therefore, the issue before us is whether Bartsch's experts' testimony, taken as a whole, reflects the requisite degree of certainty, although neither uttered the "magic words" that they held their opinions within a reasonable degree of medical probability. Dr. Rodrigues engaged in the following give and take at trial:

> Q: Based on your treatment . . . and the knowledge of her medical history . . . what do you believe was the cause [of] the damage to [Bartsch's] spine?
>
> A: I believe the cause was the [motor vehicle accident] in question.
>
> Q: What is it about being in a crash that is consistent to the injuries and the damages that you see in her spine that's consistent to her diagnosis?
>
> A: I believe that it's due to hyperflexion/hyperextension injury. Basically what that means is any kind of time you have trauma that puts the spine in forward, backward, lateral or rotation motion quickly it causes damage.

A-3580-16T2

Counsel later asked if Dr. Rodrigues had "any doubt that [Bartsch] sustained a permanent injury to her spine and that her injuries were caused by the . . . car accident." Dr. Rodrigues answered, "I have no doubt."

Although Dr. Rodrigues did not recite the phrase "reasonable degree of medical probability," he demonstrated his confidence at least as forcefully in his own words – "I have no doubt." Furthermore, regarding causation, he repeatedly asserted his unqualified "belief" that the car accident caused Bartsch's injury. His opinion was neither equivocal nor stated in terms of "possibilities." We conclude, therefore, that his opinion reflected the requisite degree of certainty.

Dr. Burt's testimony, in contrast, was less certain, as he did not clearly convey a confidence to a degree of probability. When asked if the damage was permanent, Dr. Burt answered:

> As far as the disc bulge, yes. As far as the nerve with inflammation, that's down but it can recur. . . . So, in 2013 she can be at a [pain level of] two out of ten but it's very possible that any movement with the disc bulge still sitting there can re-irritate a nerve root again, even after that. So, yes, it's a good possibility that the original cause and the original disc bulges can lead to permanent symptoms, depend[ing] on what you do in activity.
>
> [Emphasis added.]

11

When counsel then asked him if the accident had caused Bartsch's injuries, Dr. Burt said, "My answer to that is yes." Counsel prodded him further, "How do you know that?" Dr. Burt responded:

> [T]hose symptoms that she came in for were sudden and then in the treatment of them, if it was nerve root inflammation that goes down, the symptoms can go down when treated acutely, then those discs were moved at some time from some kind of trauma and this accident is what matches up to me.

Though it was clear Dr. Burt stood by his testimony, his choice of words fell short of conveying an opinion to a reasonable degree of medical probability. Regarding permanency, the most he expressed was that it was "very possible" and "a good possibility" the injuries were permanent. Regarding causation, his most forceful language was "yes" and "this accident is what matches up to me." These remarks reflected only that Dr. Burt considered his opinion reasonable or plausible.

Nonetheless, the court erred in dismissing plaintiff's suit for failure to present essential expert opinion as to permanent injury, as plaintiff met that requirement through the testimony of Dr. Rodrigues.

B.

Bartsch contends that Dr. Decter's recitation of Dr. Kopacz's report was inadmissible hearsay relating to a complex and contested issue. We disagree.

12

We review the trial court's evidentiary ruling for an abuse of discretion. Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 269, 382 (2010). However, we owe no deference to an evidentiary ruling based on a misapplication of the law. Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011).

Under the "business records" exception to the hearsay rule, medical records are admissible to prove the truth of the matters stated therein, absent indicia of untrustworthiness, when made by someone "with actual knowledge or from information supplied by such a person"; "at or near the time of observation"; and "in the regular course of business." N.J.R.E. 803(c)(6). However, an opinion or diagnosis included in the medical record shall not be admitted to prove its truth "if the declarant has not been produced as a witness unless the trial judge finds that the circumstances involved in rendering the opinion" support its trustworthiness. N.J.R.E. 808; see also N.J.R.E. 803(c)(6) (stating "opinions or diagnoses" are admissible as business records "subject to Rule 808"). Those circumstances include "the motive, duty, and interest of the declarant, whether litigation was contemplated by the declarant, the complexity of the subject matter, and the likelihood of accuracy of the opinion." Ibid.

On the other hand, a testifying expert may base his or her opinion on "facts or data" otherwise inadmissible as hearsay, so long as experts in the field would reasonably rely on those materials. N.J.R.E. 703. Introduction of such hearsay facts or data, however, is permitted only "for the limited purpose of understanding the basis of the testifying expert's opinions," not for the truth of the asserted facts. McLean v. Liberty Health Sys., 430 N.J. Super. 156, 173-74 (App. Div. 2013). "The testifying expert must not function as a mere 'conduit' for the substantive admission of inadmissible hearsay." Agha, 198 N.J. at 63.

A non-testifying expert's opinion is only admissible, whether as a "business record" or as "facts or data . . . upon which a" testifying expert relies, if it consists of "routine" – as opposed to "disputed or complex" – findings. James v. Ruiz, 440 N.J. Super. 45, 63, 66 (App. Div. 2015). Courts have "traditionally admitted 'routine' findings of experts contained in medical records that satisfy the business record exception, but ha[ve] excluded 'diagnoses of complex medical conditions' within these records." Id. at 63 (citing State v. Matulewicz, 101 N.J. 27, 32 (1985)).

To admit complex and disputed opinions would deprive the adverse party "an opportunity to cross-examine the declarant on a critical issue" that other experts may have approached differently. Nowacki v. City Med. Ctr., 279 N.J.

Super. 276, 282-84 (App. Div. 1995) (holding hospital record characterizing injury as "pathologic" was an inadmissible complex, disputed opinion as it could be interpreted as a conclusion on causation, and opposing party needed opportunity to challenge the judgment behind that characterization); see also Brun v. Cardoso, 390 N.J. Super. 409, 421-22 (App. Div. 2006) (excluding non-testifying doctor's MRI reading contained in record because MRI interpretation is nuanced and the subject of differing opinions; allowing the opinion would "bootstrap" it into evidence without an opportunity to cross-examine its author).

Here, the trial judge did not abuse his discretion by allowing Dr. Decter to testify about Dr. Kopacz's observations. The report involved issues that, while disputed, were not "complex" within the contemplation of N.J.R.E. 808. Dr. Decter said that Dr. Kopacz "found preserved range of motion of her back and her neck, no neurological deficits or anything like that."[3] Bartsch "moved slowly" but with a normal gait; she had normal "sensation to light touch and pin prick in her upper and lower extremities," without the "patchy" areas lacking sensation of which she complained; she had normal "motor" capacity; she had

---

[3] We recognize that the diagnosis of neurological conditions are often complex opinions. But, in context, we understand "neurological deficits" simply to refer back to the non-complex observation that Bartsch could move her back and neck without restriction.

15

"negative tinels and falens," which Dr. Decter explained, signaled that she did not suffer from carpal tunnel syndrome. These findings did not involve specialized or complex evaluations.

We therefore discern no error in the court's evidentiary ruling, permitting Dr. Decter to convey Dr. Kopacz's objective findings.

C.

We next address the trial court's exclusion of Bartsch's husband as a fact witness at trial. We agree with Bartsch that her interrogatory answers, together with her deposition, put defendant on notice that her husband would testify, and the trial judge abused his discretion in barring Bartsch's husband's testimony.

"The discovery rules are to be construed liberally and broadly to facilitate the search for the truth during litigation." Thomas v. Toys "R" Us, Inc., 282 N.J. Super. 569, 581 (App. Div. 1995). Nonetheless, a party may not resort to "[c]oncealment or surprise." Ibid. (quoting Lang v. Morgan's Home Equip. Corp., 6 N.J. 333, 338 (1951)). A party is required to amend interrogatory answers to correct incompleteness or inaccuracy. R. 4:17-7.

The trial court may, in its "sound discretion," sanction a party by excluding a witness whom an adversary fails to name in response to a request. Brown v. Mortimer, 100 N.J. Super. 395, 401-02 (App. Div. 1968). The sanction

will be upheld so long as "just and reasonable." Id. at 401. However, three factors "strongly urge the trial court, in the exercise of his [or her] discretion, to suspend the imposition of sanctions, namely, (1) the absence of a design to mislead, (2) absence of the element of surprise if the evidence is admitted, and (3) absence of prejudice which would result from" admitting the evidence. Id. at 402. "'Prejudice'in this context refers not to the impact of the testimony itself, but the aggrieved party's inability to contest the testimony because of late notice." State v. Heisler, 422 N.J. Super. 399, 415 (App. Div. 2011).

In Thomas, we affirmed the trial court's order excluding a personal injury plaintiff from introducing a positive X-ray discovered in her doctor's file at trial. 282 N.J. Super. at 580-81. We noted the surprise to defendant, which could not have anticipated the X-ray report, in the absence of a report from the plaintiff's physician, and in light of other negative diagnostic tests. Id. at 582. We also stressed the prejudice to defendant, which "had prepared a case built around a theory that no objective medical findings through X-rays or MRIs were reported," and was not prepared to cross-examine the doctor on the X-ray or to question its own expert on the X-ray's significance. Ibid.

In contrast, where the plaintiff "should have been fully prepared to deal with" a new expert's report, the court did not err in permitting the expert to

testify. See Gaido v. Weiser, 227 N.J. Super. 175, 192-93 (App. Div. 1988) (holding evidence was properly admitted where it was "in line with the theory of the case" prepared by opposing party); Brown, 100 N.J. Super. at 401-02 (holding evidence was properly allowed where the witness was not specified but the adverse party anticipated another witness in his stead).

Here, Bartsch did not specifically name her husband as a fact witness, and she did not timely amend her answer to the interrogatory upon deciding her husband would testify. However, the trial judge acknowledged that Bartsch's failure to amend her answer was not designed to mislead defendant. Therefore, the sole question is whether the husband's testimony reasonably would have surprised or prejudiced defendant.

Regarding surprise, defendant was aware Bartsch had a husband and that she claimed diminished sexual relations as a result of the accident. Additionally, Bartsch listed "family members" in her answer to defendant's interrogatory. We conclude defendant was on notice that Bartsch's husband was a potential witness; it was, furthermore, to be expected that he might testify about the effect of the accident on his wife's domestic life.

As for prejudice, defendant should have been prepared to confront the husband, given plaintiff's disclosure in her disposition. To avoid any

18

conceivable prejudice from the late discovery that the husband would testify, the trial court could have permitted defendant to depose the husband mid-trial, rather than bar his testimony.

In sum, we conclude the court mistakenly exercised its discretion in barring the husband's testimony.

D.

We next address Bartsch's claim that the trial judge improperly barred her from cross-examining Dr. Decter on his censure by the American Association of Orthopaedic Surgeons. We affirm the trial court's decision.

A party may attack a witness's credibility with "evidence in the form of opinion or reputation" relating to the witness's propensity for truthfulness or untruthfulness. N.J.R.E. 608(a). However, evidence in a civil trial of "specific instances of conduct" involving untruthfulness, other than evidence of a conviction, is inadmissible to impeach a witness's credibility. N.J.R.E. 608(a); N.J.R.E. 609; see also Delgaudio v. Rodriguera, 280 N.J. Super. 135, 143-44 (App. Div. 1995) (stating that a Board of Medical Examiners' opinion that a witness had a "propensity . . . to play somewhat fast and loose with the truth" was admissible under N.J.R.E. 608, although evidence of the underlying conduct was not).

19

Here, Dr. Decter's censure by the American Association of Orthopaedic Surgeons was inadmissible to impeach his credibility under N.J.R.E. 608 because it was not in the form of opinion or reputation testimony, but instead reported a specific instance of conduct. Since the censure involved no conviction for a crime by a competent court of law, it was not admissible under N.J.R.E. 609.

Bartsch's remaining points lack sufficient merit to warrant extended discussion. See R. 2:11-3(e)(1)(E).

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3580-16T2